Argued November 4, 1941; reversed January 27, 1942

# WEYERHAEUSER TIMBER CO. v.
# GALLOWAY ET AL.

(121 P. (2d) 469)

Before Kelly, Chief Justice, and Bailey, Belt, Lusk, Rand, Rossman and Brand, Associate Justices.

*Ralph R. Bailey*, Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for appellants.

*Charles A. Hart*, of Portland (W. E. Heidinger, of Tacoma, Wash., and Hart, Spencer, McCulloch & Rockwood, of Portland, on the brief), for respondent.

ROSSMAN, J. This is an appeal by the defendants from a declaratory decree of the circuit court entered in favor of the plaintiff in a suit instituted by it for the purpose of securing the awarded relief. The plaintiff is a Washington corporation which is subject to the excise tax imposed upon corporations by §§ 110-1501 to 110-1527, O. C. L. A. The defendants are the three members of the state tax commission; the latter was

created by § 110-501, O. C. L. A. The plaintiff does business in other states as well as in this state. Its activities are, therefore, within the purview of § 69-1307, Oregon Code 1935 Suppl., which reads:

"If the gross income of a corporation is derived from business done both within and without the state, the determination of net income shall be based upon the business done within the state, and the commission shall adopt such rules and regulations as will fairly and accurately reflect the net income of the business done within the state."

For a later form of that statute, see § 110-1507, O. C. L. A. In the exercise of that authority, the commission promulgated two rules—Articles 182 and 187. The former governs the use of the apportionment method and the latter delineates the segregation or separate accounting method. The decree under attack held that Article 182 is applicable to the plaintiff's business and that the plaintiff "is entitled to file its annual returns for excise tax purposes for the years 1936 and 1937 under the apportionment method as prescribed in Article 182." Although the complaint mentions the returns for 1936 and 1937 only, the controversy in reality affects the plaintiff's return for every year.

In order to render more understandable what follows, we state that, under the circuit court's decree, the part of the plaintiff's net income which is taxable by this state is determined by awarding to Oregon an allocating percentage of the plaintiff's total net income from its business wherever pursued. To illustrate, we resort to the plaintiff's 1936 return. According to it the plaintiff's 1936 gross income was $12,641,678.85. It was derived from the plaintiff's nation-wide business. The net income was $1,290,038.32. The latter is the remainder after all of the plaintiff's expenses,

wherever incurred, were deducted from $12,641,678.85. According to the return, 19.422% of this net income was earned in Oregon. That percentage was computed in the following manner: 23.6% of the plaintiff's real and personal property was in Oregon; 17.165% of its wages was paid in this state, and 17.502% of its sales was Oregon material. The average of those three percentages is 19.422%. Article 182 authorizes resort in that manner to the factors of property, wages and sales whenever apportionment is permissible. This return deemed the plaintiff's business as unitary and was based upon the theory that no part of its business, for either income or expense purposes, could be segregated.

The defendants present several contentions. We shall confine ourselves to one of them—their contention that no justiciable issue exists between the plaintiff and the tax commission. They state that they have not yet passed upon the issue which the plaintiff submits.

Article 182 follows:

"If the business activities of a taxpayer are carried on both within and without the state (whether by the same corporation or by affiliated corporations) and the character of the business is such that a separate accounting would necessitate the making of charges for goods, services or interest or the allocation of supervision costs or similar items between the business in the state and that outside of the state, the income properly attributable to Oregon may be fairly reflected only by treating the business within and without the state as a unit. In order to fairly and accurately reflect the net income of such a business which is attributable to Oregon, the apportionment method as prescribed in this article has been adopted and will be required to be used by all taxpayers whose business is of such character.

"The net apportionable income apportioned to Oregon shall be determined by giving equal weight to the amount and location of the three factors as herein

defined. If, however, in the opinion of the commission, the prescribed formula is not fairly calculated to assign to the state the portion of net income reasonably attributable to the business done within this state, the commission may require or permit such other method of apportionment of income as is fairly calculated to determine such portion of net income. In any event, the factor method must be submitted by all taxpayers required to report on the apportionment basis and its use may be required."

Here follows a delineation of the above-mentioned factor formula.

Article 187 follows:

"The separate accounting method will be required as to those businesses the Oregon unit of which is entirely unrelated to the business in other states except for common ownership and control. Oregon branches of a concern which also operates outside of Oregon may not report upon the separate accounting method, even though all allocated items are eliminated, if the business is such that an allocated return is required by Article 182. * * *"

The plaintiff was originally engaged in the business of investing in timberland. At the time of the trial it owned 600,000 acres of timberland in this state and 800,000 acres or more in Washington. About 1917 the demand for its timberland had slackened and some of its timber was becoming overripe. About that time the plaintiff decided to supplement its operations by engaging in the manufacture of lumber. In 1917 it built a mill in Everett, Washington, and in 1928 another in Klamath Falls. At the times with which we are concerned the plaintiff had sawmills in Klamath Falls, Oregon, and Everett and Longview, Washington, pulp mills at Everett and Longview, and extensive logging

operations at Vail, Washington. The plants in Washington handled nothing but fir, spruce and hemlock. The mill at Klamath Falls confined itself to pine. Pine lumber yields a better price and commands a more stable market than fir. Since 1917 the plaintiff, in addition to being a manufacturer of lumber and pulp, has continued in its original pursuit—the holding of timberlands and their sale when favorable opportunity offers. Some of the plaintiff's timberland is not contiguous to its mills and, hence, is deemed investment timberland.

The main office of the plaintiff is in Tacoma, Washington. It is in charge of an executive vice-president. Under him are a general manager and an assistant general manager. Under these three principal executives are various department heads who supervise the several departments: tax, land, legal, accounting, reforestation, engineering, etc.

Except for sales made locally by the mill, none of the plaintiff's products are sold directly by it. The sales are made by a nonprofit subsidiary, the Weyerhaeuser Sales Company. It sells the plaintiff's products under a contract whereby it determines credits and adjustments and collects the sales proceeds. The sales company maintains divisional offices in Tacoma, St. Paul, Minnesota, and Newark, New Jersey. Through the medium of another subsidiary the plaintiff maintains distributing plants in Newark, Baltimore, Maryland, and Portsmouth, Rhode Island. In those yards stocks of the plaintiff's lumber are kept for supplying the trade. It files returns for excise taxes in Minnesota, Massachusetts, Maryland and New York.

As is seen from the foregoing, the plaintiff's only manufacturing plant in this state is located at Klamath

Falls. According to J. S. Obenour, one of the plaintiff's officials, "The Klamath Falls branch's only function is the production of the material, and they have nothing to do with the distribution of the products. That is all controlled from the Tacoma office." However, in the plaintiff's office at Klamath Falls auditors maintain a set of account books. Obenour, referring to the Klamath Falls books, testified: "A charge is made to that branch through our Tacoma office account which controls the accounting and expenditures of money for all fixed assets for that mill, and the mill expenditures for improvements, whether for capital or expense. All expenditures of that nature and all inventories are reflected in the branch set of books, and they in turn are credited with the gross sales price received from the lumber wherever it was sold. They are charged with the advertising, sales, and other expenses, together with a portion of the administrative charges of the Tacoma office, all of which are allocated back, not only to that plant but to all plants."

It will be recalled that the Klamath Falls plant was built in 1928. In that year the excise tax law was enacted. In the years 1930, 1931, 1932, 1933 and 1934 the plaintiff in preparing its tax returns employed a method which the stipulation terms the segregation method, but which was in reality a combination of that method and the allocation method. Under it the Klamath Falls operations were segregated from all others for the purpose of determining income and the cost of production. To the Klamath Falls plant there was credited the sales price of all lumber it produced, and there was deducted from the total (1) the cost of production and (2) an apportionment of all administrative, sales and other departmental expenses. The bal-

ance was deemed the net income produced by the business done within this state. In all of the above computations effect was given to the Klamath Falls books.

September 29, 1936, the plaintiff filed its return for its 1935 operations. This return was also computed by the use of the Klamath Falls books. Klamath Falls operations were segregated from the others in the manner described in the preceding paragraph and from the net results there was deducted an allocated percentage of all administrative and departmental expenses. This return showed a net income of $102,392.87 derived from the business transacted in this state. Eight per cent of that is $8,168.28, the amount of the excise tax. The return deducted $6,126.21 for personal property taxes, which had been paid, leaving a balance of $2,-042.07. That amount was paid to the tax commission. The return entered gross receipts of $3,265,680.69, all derived from the sale of products manufactured at Klamath Falls.

Shortly after the 1935 return was filed, Obenour concluded that the computation of the plaintiff's excise taxes was governed by Article 182, and not by 187, and that therefore the allocation, and not the segregation, method should be employed. He swore that prior to 1935 the operations were unprofitable and that therefore it was immaterial which of the two methods was employed. At the same time Obenour concluded that the Klamath Falls books did not correctly record the net profit derived from the Oregon operations. He mentioned three deficiencies. The first of these was in the entry of the capital investment. The second was in the computation of the income of the Klamath Falls mill. Seventy per cent of its products go directly to the buyer and 30% into the storage yards. This 30% is

credited to the Klamath Falls income at the price current when it enters the yard and not at the price at which it subsequently sells. His third criticism was that the charges made against Klamath Falls operations for administrative, engineering and other services were too low. He did not support his criticism with any figures, instances, entries or data.

In the computation of the 1936 tax return the plaintiff employed the allocation method. We have already stated that this return indicated that the plaintiff's net income was $1,290,038.32 and that 19.422%, or $250,-551.24, was apportioned to Oregon. A tax of 8% upon that sum amounts to $20,044.10. From the latter an offset of $15,033.07 for personal property taxes was claimed, leaving a net tax of $5,011.03, which was paid. The Klamath Falls books showed that in 1936 the Oregon plant had a net income of $1,121,492.94. From net sales of $4,930,406.65 the Klamath Falls books deducted the cost of production, shipping, selling, bad accounts and that plant's allocated share of other administrative and departmental expenses. The deductions reduced the aforementioned sum of $4,930,406.65 to the net profit of $1,121,492.94.

The plaintiff does not contend that its Klamath Falls entries were not made by its auditors; nor does it say that the entries were made through error. We have given Obenour's criticism of those books. He swore that the Klamath Falls records were not intended to reflect accurately the branch's net earnings. According to him, those books are kept for a restricted purpose. He said: "The reason they were maintained there is to keep a record of the cost and from that is determined whether they can produce and sell at a profit or not." Further, he testified that the Klamath

Falls books were kept "primarily and solely for the investment record or the capital investment of the Klamath Falls branch and also a record of the expenditures made in connection with the production of— or to produce that lumber."

Although Obenour made the aforementioned criticisms of the Klamath Falls records, we observe that a formal stipulation signed by the parties speaks thus of the branch books, including those at Klamath Falls:

"A separate set of accounts and records are maintained by each branch which reflect the investment in buildings, machinery, etc. and record the accrued depreciation thereon. These accounts also reflect the gross price at which the lumber or other products originating in each plant are sold to the trade through the sales company or are transferred to the various distributing yards. The accounts also reflect all direct expenses of the logging and lumbering operation to point of shipment. In addition, an allocated portion of administrative expense, selling expense, collection expense, advertising expense, etc., originating at Tacoma and other points are recorded."

Five months after the 1936 return, that is, on March 3, 1938, the plaintiff submitted an amended return for 1935. It, like the 1936 return, used the allocation method. Whereas the original 1935 return showed a net profit from Oregon operations of $102,-392.87 and a tax liability of $8,168.28, the amended return showed a net loss for Oregon of $27,916.64. It will be recalled that the original return deducted from $8,168.28, personal property taxes amounting to $6,-126.21, leaving a balance of $2,042.07. The amended return was accompanied with a claim for a refund of the previously paid tax.

The plaintiff's change from the segregation to the apportionment method was challenged by the tax com-

mission. Mr. Fisher, one of the defendant commissioners, wrote to the plaintiff on May 17, 1938:

"It appears the original return for the year 1935 and the return for prior years were prepared from an accounting of the Oregon business and that the change to allocation was prompted by an understanding that the law and regulations require the use of the apportionment method."

The letter then stated the commissioners' view of the law. The concluding lines of the letter follow:

"Accordingly, we must reject the amended 1935 return and decline the claim for refund of taxes paid for that year. For the same reason, we cannot accept the return filed on the apportionment basis for the year 1936 without a definite showing that it fairly reflects the net income of the business done within this state. We trust you will agree that the actual income produced by the Oregon business is the fair and proper basis for arriving at the excise tax liability."

That letter apparently brought no reply. On June 23, 1938, the tax commission, through one of its auditors, notified the plaintiff that it had adjusted the plaintiff's 1935 return by substituting a timber-depletion rate of $5.25 per thousand feet instead of $6.00 per thousand, the rate which the plaintiff had been employing. This adjustment added $1,580.11 to the amount of the tax. On the same day the same auditor, over the commission's signature, notified the plaintiff in another letter that "the allocated return filed for 1936 does not properly reflect the net income in Oregon." The letter called attention to § 69-1307, Oregon Code 1935 Suppl. (§ 110-1507, O. C. L. A.) and added:

"Your business in Oregon is an entirely separate unit and the business is conducted and the books kept in such a manner that a segregated return showing

Oregon operations only will accurately reflect the net income of the business within the state. Returns for prior years were consistently filed on a segregated basis * * * and apparently such prior returns were considered by your company as properly reflecting Oregon income, * * *. The Commission has therefore reached the conclusion that the return filed for 1936 is in error, and requests that a corrected report be filed on a segregated basis * * *. The Commission further holds that the maximum rate allowable in the Jenny Creek area and the Klamath area west of the lake is 5.25 per M., therefore depletion should be claimed on this basis on timber cut in these areas.''

June 27, 1938, the plaintiff replied to both letters. It said, in part:

''We believe that your findings both in respect of requirement of a segregated return and depletion rate are in error. Your letter relating to 1935 demands payment within ten days. We respectfully call your attention to Section 69-1321(h) which secures to us right to conference within thirty days and we demand an opportunity to present additional facts and arguments at such a conference.''

The commission replied that it was agreeable to a conference. July 12, 1938, five representatives of the plaintiff met with the three commissioners. According to the stipulation, a letter sent by the commission to the plaintiff September 7, 1938, gives a fair indication of the subjects discussed at the conference and the conclusions which were reached. That letter, after referring to the commission's two letters of June 23 said:

''At that time, additional time was requested by the taxpayer within which to prepare, and submit, an allocated return covering only the mill operations in and out of the state. Such a procedure would be predicated

on the basis that merging of timber holding activities, and mill operations, on the same return results in a reduction of the amount of net income properly reportable, and taxable, in the State of Oregon.

"It is the conclusion of this office than an allocated return, such as the amended return filed for the year 1935, and return filed for 1936, do not properly reflect the net income taxable in this state. Likewise, it is our conclusion that a rate of 5.25 per M. is proper on pine timber in * * *. A formal opinion and order has not been issued setting out the above conclusions of the commission, due to a desire to allow more than sixty days for the preparation of a 1936 return on the segregated basis. The issuance of an opinion and order would leave the taxpayer with the alternative of either complying therewith, or taking an appeal to the circuit court, within sixty days.

"It is respectfully requested that a 1936 return, prepared on the segregated basis, be submitted in the near future. In the meanwhile, a formal opinion and order will be held in abeyance. Likewise, kindly indicate whether it is your conclusion that the depletion rate set out in audit letter of June 23 will be accepted * * *."

In November, 1938, two representatives of the tax commission conferred in Tacoma with representatives of the plaintiff. The stipulation gives an account of what occurred at that conference; the following is quoted from it:

"At this conference there were discussed the various factors which, in the conclusion of the State Tax Commission, resulted in the allocated returns filed for 1935 and 1936 failing to fairly and accurately reflect net income realized from business done in the state. There was also discussed the proposition of reporting only sawmill and logging operations on the allocated basis, and timber holding activity on the segregated basis, and representatives of the plaintiff offered to assemble the data for the computation of tax liability

for the years in question on this basis. As a result of this conference there was addressed to the commission by the plaintiff on December 21, 1938, a letter * * *." We now quote from that letter:

"In accordance with our conversations when you were in Tacoma, we enclose herewith statement of income and expenses for years 1936 and 1937 applicable to nonoperating timberland in the Oregon Fir district and to our Portland mill site.

"As we are of different opinions regarding the kind of return required and with the purpose in mind to eliminate any differences, we have worked out a return, which we believe will meet with your approval and can be used for the years in dispute and subsequent years, so long as there is no major change in operations. * * *"

The letter then commented upon the newly proposed method of computing Oregon income. It continued:

"As it is impractical to give all of the details of our proposed return by correspondence, Mr. Orr and I would like to submit the same in person, at which time we could give answer to any questions or discuss any detail. If this is agreeable to you, we can arrange to be in Salem on December 28th * * *."

The tax commission replied that it was agreeable to a conference to be held December 28, 1938. Upon that day representatives of the plaintiff met with one of the defendants and two other representatives of the tax commission. According to the stipulation, the following occurred at the conference:

"The representatives of the plaintiff were informed at this conference that it was the conclusion of the commission that the timber depletion rate on timber cut in Oregon should be reduced from $6.00 per thousand feet to $5.25 per thousand feet, and that returns should be filed on the basis of an allocation of net income realized from sale of lumber, and by-products, manufac-

tured in Oregon between manufacturing activity within the state and any intrastate sales activity conducted in other states.''

Nine days later, without anything else having occurred, the complaint which instituted this proceeding was filed.

Even after the complaint had been filed, the defendants, in a letter to the plaintiff, sought information of substantially the same kind they previously had asked for. This additional request, however, was quite detailed. According to the defendants' brief:

''It is the appellants' position, and always has been, that the respondent should be required to file verified statements computing the net income realized from the manufacture and sale of timber products produced in the Oregon plant. Thereafter, the net income so ascertained should be allocated between the manufacturing activity within the state and the sales and administrative activities outside the state. Thus the total corporate activities in and out of the state, connected with the manufacture and sale of Oregon timber products, would be treated as a unit. Only the income and expenses which result from the management of Oregon timberlands, and other properties in the state not involved in plant operations should be segregated and separately reported on the Oregon return. * * * The appellants' primary objection to the returns filed is that they purport to compute Oregon income by including in the apportionment a conglomeration of outside activities wholly unrelated to the corporate business in Oregon. The appellants do not urge the abandonment of apportionment, but, rather, the application of apportionment to that phase of the corporation's activities in and out of the state which is in fact unitary. * * * There are several approved accounting methods available whereby the accuracy of an apportionment of total net income can be tested. The appellants were in the process of compiling the information

essential to the completion of these tests when the complaint was filed in this suit. * * *"

The plaintiff has contended ever since it filed its 1936 return (September 27, 1937) that its business is a single unit within the contemplation of Article 182 promulgated by the tax commission. It insists that the Klamath Falls operations can not be separated from the rest of its business activities. Obenour swore that it would be expensive, if not impossible, to gather the information which the defendants request. He referred especially to the defendants' request that the plaintiff furnish figures showing the cost of lumber production in the Klamath Falls mill.

Since the defendants' insistence upon a reduction of the timber depletion rate from $6 to $5.25 per thousand feet is not mentioned in the complaint and is not attacked in the plaintiff's brief, we assume that no declaration is sought concerning the depletion rate.

It is, of course, clear that the defendants in the course of their above-described conduct were endeavoring to gather information. Incidentally, § 110-1524, O. C. L. A., authorizes the commission to examine records and demand information. The uses which the defendants intended to make of the information which they were seeking were several. For instance, it is the duty of the tax commission to audit tax returns: § 110-1521, O. C. L. A. The returns submitted by the plaintiff for the years 1936 and 1937—those being the two returns expressly mentioned in the complaint—have not yet been audited. They have neither been approved nor finally rejected. The defendants intended to use the information which they sought in the audit of those returns. Next, we infer that the defendants desired to ascertain from the information which they were seeking whether the timberland owned by the plaintiff for in-

vestment purposes in the state of Washington could be segregated from its manufacturing activities. Apparently they thought that the plaintiff's business was not a single unit, but that the investment timberland was separable from the other parts. The evidence indicates that the real property tax paid upon the Washington timberland and the sums expended for the protection of that timber against fire and other hazards are large. The stipulation says:

"* * * The activities appertaining to the ownership, preservation, purchase and sale of timber and timberlands are conducted by a department separate from those engaged in lumber manufacturing operations."

It also seems that the defendants were endeavoring to determine whether the Klamath Falls books were a correct index to the net income derived by the plaintiff from its Oregon business or whether those books were subject to the criticisms made by Obenour. In the correspondence and in the course of the conferences the defendants, although favorably disposed to the segregation method, did not insist upon its employment as the sole means of determining the plaintiff's net income from its Oregon business. They were agreeable to the use of the allocation method, in part at least. Upon the other hand, the plaintiff was constantly urging the allocation method.

In the period of time that has passed since the returns for 1936 were filed, the tax commission has not assessed against the plaintiff any additional tax. We have not overlooked the letter of June 23 concerning the depletion rate. However, that notice was shortly abandoned and at any rate the depletion rate is not involved in this suit. The plaintiff concedes that no additional tax has been assessed and that it has received

no notice of any assessment. An additional tax can not be assessed except by giving notice to the taxpayer: § 110-1522, O. C. L. A. Due to these circumstances, it seems clear that all of the conclusions expressed by the defendants have been tentative.

For the sake of greater accuracy, we quote the following from the aforementioned stipulation:

"The plaintiff has received no preliminary notices from the State Tax Commission computing additional excise taxes on the returns filed for the years 1935, 1936 and 1937, except the audit letter of June 23, 1938, * * *. The plaintiff has received no notices of proposed assessment of additional excise taxes for the years 1935, 1936 or 1937, nor have any notices been received by the plaintiff that the State Tax Commission has assessed additional excise taxes for any of such years. * * *

"The plaintiff has received notice from the State Tax Commission, that in the opinion of the latter, an apportionment of the total net income realized by the Weyerhaeuser Timber Company from all corporate activities conducted in and out of the state does not fairly and accurately reflect the net income realized by the corporation from business done in Oregon. The plaintiff has received notice from the State Tax Commission that, in the opinion of the latter, net income from business done in Oregon would be fairly and accurately reflected by making an apportionment of net profit realized from the sale of lumber, and by-products, manufactured in the Klamath Falls Branch plant between the manufacturing activity within the state and the intrastate sales activity outside the state."

Section 110-1522, O. C. L. A., confers upon taxpayers the right to a judicial review of the determinations of the commission concerning taxes. It is agreed that the plaintiff has not sought to avail itself of this right; in fact, since the commission has made no final determination, no appeal could be taken.

The above will suffice as a statement of the facts. We omitted mention of several modifying details.

■ The statute which creates the tax liability under consideration imposes upon the tax commission the duty to administer and enforce the act: § 110-1524, O. C. L. A. As we have seen, the statute yields to the commission authority to inspect books, demand information and audit returns. Further, it gives the commission the authority upon which the parties dwell at length: the power to prescribe rules: §§ 110-1507 and 110-1524, O. C. L. A. The purpose of all of this, so far as it bears upon corporations whose activities are similar to those of the plaintiff, is to secure returns which accurately reflect their Oregon earned net income.

A wide range of discretion is vested in the tax commission. Not only do the words of the statute expressly confer such discretion, but the very nature of the commission's duties demands that it possess broad discretionary powers. The duties which we have in mind are among others the ones which require it to write rules, to audit returns, to inspect books, to impose penalties, to demand information and to take such course as may be necessary to enforce payment from a contumacious delinquent. Those duties are of a very practical nature and must be performed in a practical way.

In an effort to bring about returns which fairly "reflect the net income of the business done within the state" the commission availed itself of the authority conferred by § 69-1307, Oregon Code 1935 Suppl. (as amended, § 110-1507, O. C. L. A.) and wrote its two rules governing the use of the apportionment and segregation methods. Those rules express in language

of a general nature the two types of business activity to which they are applicable.

■ As we have seen, the tax commission has not audited the returns submitted by the plaintiff for the years 1936 and 1937. The other returns are not mentioned in the complaint. The auditing was under way when this suit was filed. The record does not indicate what the commission will do with those returns. Undoubtedly it would welcome returns of the kind submitted before the 1936 return was filed. But it is clear that the commission is prepared to accept some other return if the one which it prefers can not be conveniently submitted. According to the stipulation, the defendants so expressed themselves at the last conference held by the parties which occurred only a few days before the complaint was filed. The correspondence, the stipulation and the evidence do not indicate that the defendants have become stubborn, arbitrary or nonyielding to the facts. They apparently are anxious to ascertain what information is available and what method of computation will come nearest to indicating the net income of the Oregon business. In short, the commission was exercising the authority conferred by the act and was engaged in the performance of the duties exacted by it when this complaint was filed.

We are satisfied that any declaration of the rights of the parties would project the court which makes the declaration into a performance by it of the commission's administrative duties; in fact, into the exercise of the discretionary powers which belong to the commission. This is not an instance in which a controversy exists between the taxpayer and the commission concerning the meaning of the controlling statute or its constitutionality. The latter is not questioned, and the parties agree that § 69-1307, Oregon Code 1935 Supp.,

means that the basis of the plaintiff's tax liability is its net income from its Oregon business. It is true that the plaintiff insists that the method which should be employed is the one prescribed in Article 182, and that the defendants have not yet been willing to accept the tax return compiled under that rule by the plaintiff for the two controversial years of 1936 and 1937. In their briefs, the defendants refer to Article 182 as flexible. The plaintiff does not so regard it. The defendants do not find the source of the purported flexibility in the language of Article 182, but in reading that language in conjunction with § 69-1307, the statute which confers upon the defendants their authority to write rules and which requires that the returns fairly and accurately reflect the net income from the Oregon business. That proposition, of obvious merit, the plaintiff does not dispute. Since the plaintiff, prior to 1936, compiled its returns by use of the segregation method in part and the allocation method in part, we assume that it does not question the validity of that combination of methods. Be those matters as they may, the pleadings do not allege that there is any controversy between the parties concerning the meaning of the rules. The complaint asks for no interpretation of them; rather, it indicates that their meaning is clear. It charges that although the defendants are bound by the rules, they manifest a disposition to act arbitrarily. There is no proof of the latter averment. The defendants concede that they are bound by their rules.

It is our belief that the difficulty which perplexes the parties does not concern the governing principle of law, but rather the nature of the business done by the plaintiff; that is, whether it is unitary or otherwise in character. The plaintiff insists that the business is a single nondivisible unit. The defendants are doubtful

and point to the fact that until the 1936 return was filed the plaintiff had deemed the business segregable. The defendants' primary position is their insistence upon more information from the plaintiff concerning its business. Thus the disagreement which exists between the parties—if the quandary can be termed a disagreement—does not arise out of varying views concerning the law, but out of the facts. It seems clear that if the defendants deemed the plaintiff's business a unit they would have accepted the return computed under the apportionment method. That is only another way of saying that the difficulty which perplexes the parties hinges upon a determination of the facts.

■■ The defendants can not know how they ought to measure the plaintiff's net income until they have decided whether its business is unitary or otherwise. The determination of the nature of the business is purely a question of fact. The plaintiff assumes that its business is unquestionably of the type mentioned in Article 182; but we do not believe it has been conclusively demonstrated that its business is unitary. We realize that generally issues of fact are, in part, issues of law, but a determination of the nature of a business such as the plaintiff's is peculiarly a fact matter—to be determined in accordance with the hardheaded practical standards which are generally applicable to tax matters. The determination of that issue is assigned by the statute before us, not to the courts, but to the tax commission. The theory which underlies administrative law is that the issues with which it deals ought to be decided, not by a jury which theoretically typifies a cross section of society, but by experts. Therefore, while this issue is pending for decision before the defendants, there is even less occasion for a pronouncement of a court's views concerning it than if a litigant

whose cause is pending before a jury should ask the court for a declaratory judgment concerning one of the fact issues.

■ In pronouncing these views we have not overlooked a passage in a letter written by Obenour in which he complained that it would be expensive, if not impossible, to assemble the information which the defendants seek. However, no issue exists concerning the plaintiff's duty to supply data and no declaration is sought concerning that duty; moreover, Obenour's complaint about expense and impossibility is equivocal. Finally, the fact that the Klamath Falls books employ the segregation method seems to indicate that the information can be assembled. The mere fact that the plaintiff fears that the defendants will eventually determine its net income from its Oregon business by the segregation method, certainly can not warrant a court in pronouncing a declaratory judgment; and yet the evidence indicates nothing more than a fear.

■ The legal principle which we believe governs the situation revealed by the above-reviewed evidence is thus stated by the pre-eminent authority in the field of declaratory law:

"* * * Nor may the courts under declaratory procedure interfere with power vested in an administrative body, such as the control of a public utility commission over rates and services and the power of the N.L.R.B. to determine the proper bargaining agent for employees; nor may the courts prematurely exert their power of judicial review."

Borchard, Declaratory Judgments, 2d ed., 237. On page 878 the same treatise says:

"One of the common types of a private challenge of administrative action is the denial of the jurisdiction of the Board or agency to deal with the subject or

impair or affect the petitioner's rights. Yet at the threshold we are met by the question whether the administrative determination of the Board's own jurisdiction is conclusive, whether the administrative appeal must be exhausted before judicial review becomes permissible or whether judicial recourse may be at once sought. The answer is necessarily in first instance dependent upon specific requirements of the governing statute; but in the absence thereof it is a matter for judicial determination. Where the administrative order was considered procedural and preliminary in character, such as an order to file data, even though opened to inspection of others, the exhaustion of administrative proceedings to the point of finality was deemed a condition of judicial review. The declaratory judgment cannot and is not designed to cut down the statutory requirements for administrative review. Again, no court by declaration or otherwise should attempt to control administrative discretion, * * *."

The issue of whether the plaintiff's business is unitary or not is pending before the defendants in their capacity as the tax commission of this state. The legal principle just quoted makes it clear that until the commission has spoken the courts must remain silent. See also *Williams v. Tawes*, 179 Md. 224, 17 Atl. (2d) 137, 132 A. L. R. 1105; more especially the annotation.

The above does not include a review of the many authorities cited by the parties, but they received our attention.

The court erred in entering a decree for the plaintiff. The defendants are entitled to the decree. Costs and disbursements should not be allowed.

Lusk and Brand, JJ., concur in the result.