Argued at Pendleton October 31; affirmed December 29, 1944

# EDWARD HINES LUMBER CO. *v.* GALLO-WAY ET AL.

(154 P. (2d) 539)

Before BAILEY, Chief Justice, and ROSSMAN, LUSK, BRAND and HAY, Associate Justices.

*Carl E. Davidson,* of Portland (Reilly & Davidson, of Portland, and Casey & Kriesien, of Burns, on the brief), for appellant.

*Dean Ellis,* of Salem (George Neuner, Attorney General, and George William Neuner, Assistant Attorney General, on the brief), for respondents.

ROSSMAN, J.

This is an appeal by the plaintiff from a decree of the circuit court which sustained an order entered by the defendants, the State Tax Commissioners. The order assessed a corporation excise tax for the year 1940 in the amount of $8,284.14 against the plaintiff, based upon a finding that the plaintiff's business was not unitary in nature and that its Oregon business in

1940 yielded a net income. The plaintiff availed itself of the procedure afforded by § 110-1522, O. C. L. A., and the cause has now reached this court.

The plaintiff was incorporated under the laws of Delaware. Two issues are submitted by the appellant (plaintiff) : (1) Is it essential that a corporation which does business both within and without this state (§ 110-1507, O. C. L. A.) had a net over-all income before the defendants are authorized to assess against it the corporation excise tax (§ 110-1501–110-1527, O. C. L. A.), or will it suffice if the corporation's Oregon business yielded a net income; (2) was that part of the plaintiff's business, consisting of its ownership of 58,724 shares of the capital stock of the Continental Coal Company, an operating coal company, such an integral part of its business that the defendants were required to apply to the loss of $4,093,308.27, which resulted when that stock became worthless, the apportionment formula mentioned in § 110-1507, O. C. L. A., and thus cancel the profit which they found the Oregon operations had earned.

To the complaint the defendants filed a demurrer; it was sustained. The order sustaining the demurrer resulted in the decree challenged by this appeal. It will be seen from the procedure just reviewed that there is no issue of fact before us.

The complaint alleges that the plaintiff maintains its principal place of business in Oregon at Hines. We now quote from the complaint:

"Plaintiff's business in the State of Oregon consisted of the ownership and operation of timber lands and other real and personal property, the conducting and maintaining of logging operations within Grant County, Oregon, the maintaining and

operation of a lumber manufacturing plant at Hines, Harney County, Oregon, and the purchase and sale of timber products. Plaintiff's business in states other than Oregon consisted of the purchase, ownership, operation, and sale or disposition of timber lands, the ownership and operation of lumber manufacturing plants, retail lumber yards, and investment property; the production of logs and lumber, the sale of all timber products at wholesale and retail, and the sale or disposition of cut-over timber lands and other parcels of real property.''

In 1940, according to the complaint, the plaintiff was the owner of all of the common stock of a corporation entitled the City Corporation which was engaged in the ownership, development, rental and sale of real property at Hines. In the same year it also owned all of the common stock of another corporation entitled the Edward Hines Pacific Coast Lumber Company which was a wholesale dealer in lumber produced in mills other than the plaintiff's.

In view of the importance which the plaintiff attaches to the following paragraphs of its complaint, we quote them in full:

"At all times during the year 1940, the plaintiff was the owner and holder of 58,724 shares of the common stock of Continental Coal Company, an operating coal company, which stock comprised 93.09% of the outstanding capital stock of the Continental Coal Company as of that time. The said common stock of the Continental Coal Company was acquired by the plaintiff at the times and at the cost hereinafter set out:

"A. 39,090 shares of said 58,724 shares of stock of the Continental Coal Company were purchased prior to 1929, at a total cost of $2,553,958.30, and the said shares possessed a value of not less than $2,553,958.30 on January 1, 1929. The total cost

of all shares purchased prior to January 1, 1929, was $2,609,157.75, for 39,900 shares, but prior to 1940, 810 of these original shares were sold for $55,203.95. Of the said total cost of $2,609,157.75, the amount of $395,418.34 was expended through the medium of an exchange of preferred stocks and bonds of the Continental Coal Company for common stock thereof, which preferred stock and bonds had a value of $395,418.34 when exchanged; said preferred stock and bonds heretofore had been received by the plaintiff from Continental Coal Company in exchange for coal mining lands and properties held by the plaintiff for sale in the ordinary course of its business, and the remainder of said total cost of 39,900 shares was incurred for amounts advanced to or expended for the purchase of assets for Continental Coal Company.

"B. 7116 of the said shares of Continental Coal Company common stock were purchased by the plaintiff from that company on June 26, 1929, at a cost of $592,330.87 in cash.

"C. 10,989 shares were purchased from Continental Coal Company on October 23, 1930, at a cost of $927,930.60 of which cost $889,197.06 was represented by the transfer of coal mining lands and property owned by the plaintiff and held by it for sale in the ordinary course of its business, and the remainder of said cost was for other property transferred by the plaintiff to Continental Coal Company.

"D. 800 shares of said Continental Coal Company common stock were purchased by the plaintiff on December 21, 1930, for $4,400.00 in cash.

"E. 540 shares of said Continental Coal Company common stock were purchased by the plaintiff from an officer of the Continental Coal Company at a forced sale of $540.00. The said purchase price of $540.00 did not represent the true value of the stock at the date of purchase.

"F. 189 shares of said Continental Coal Company stock were purchased on November 1, 1937, for $14,153.00 in cash."

Continuing, the complaint avers that in 1940 the Continental Coal Company was adjudged a bankrupt and that therefore all of its stock became worthless. April 1, 1941, according to the complaint, the plaintiff filed with the defendants its corporation excise return, including

"all items of income and deductions of the plaintiff from operations both within and without the State of Oregon and included in the said return, in conformity with the rules and regulations of the defendants, all of the income and all of the deductions of the City Corporation and Edward Hines Pacific Coast Lumber Company. Upon the said return the plaintiff deducted an amount of $4,-093,308.27 as representing plaintiff's loss upon its stock of Continental Coal Company becoming worthless and as a result of such deduction the return was filed revealing a net loss of $3,618,839.26 for the year."

November 17, 1941, the defendants gave notice, according to the complaint, that the loss which the plaintiff suffered when the Continental Coal Company stock became worthless was not deductible on the plaintiff's excise return and mailed notice of a proposed assessment in the amount of $13,470.65. Later, through conferences, the plaintiff established the validity of some deductions not involved in this proceeding and the defendants reduced the assessment to $8,284.14. The complaint avers that the assessment just mentioned is erroneous "in that the defendants have failed and refused to allow plaintiff a deduction for its loss on the stock in the Continental Coal Company for the year 1940." The remaining parts of the complaint

quote regulations promulgated by the defendants pursuant to § 110-1507, O. C. L. A. In view of the fact that the regulations are nothing but an exposition of the segregation and allocation formulas, we shall omit their quotation.

The foregoing is the only information we have concerning the plaintiff, its business, income and losses.

From the above it will be seen that if the plaintiff had not suffered the loss which it incurred when the Continental Coal Company stock became worthless, it would have had a net income in 1940. The defendants determined that the plaintiff's 1940 net income, ignoring the coal company stock loss, was $588,178.00. They found that a part of that total was earned in Oregon and allocated to this state $207,103.53.

We shall now consider the first of the above issues submitted by the plaintiff; that is, that the corporation excise tax statute (§ § 110-1501—110-1527, O.C. L.A.) imposes no tax upon corporations which do business both within and without Oregon unless their entire business yields a net income.

Manifestly, when the legislature wrote our statute it could have embraced either the proposition submitted by the plaintiff or the one for which the defendants contend; that is, it could have made the act provide that no corporation doing business both within and without Oregon should be liable for a tax unless its total operations resulted in a net income; or it could have provided that all corporations should be subject to the tax if their Oregon business yielded a net return regardless of the results achieved in other states. Obviously, one or the other of those propositions was embraced by the legislature. A choice was necessarily made. In determining which was chosen,

we must, of course, look to the statute. Hence, the first of the two issues calls for nothing more than statutory construction.

In order to sustain its contentions, the plaintiff depends much upon § § 110-1506 and 110-1508 of the corporation excise tax statute.

Section 110-1506, O. C. L. A., says:

"(a) Every mercantile, manufacturing and business corporation doing or authorized to do business within this state, except as hereinafter provided, shall annually pay to this state, for the privilege of carrying on or doing of business by it within this state, an excise tax according to or measured by its net income, as herein defined, * * *.

"(b) The term 'net income', as herein used, means the gross income less the deductions allowed.

"(c) The term 'gross income', as herein used, includes gains, profits and income derived from the business, of whatever kind and in whatever form received; * * *."

Section 110-1508, O. C. L. A., says:

"In computing 'net income' the following deductions shall be allowed: * * *

"(d) (Losses) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in business."

Based largely upon the foregoing, the plaintiff insists that the defendants are not authorized to assess a corporation excise tax upon any corporation doing business both within and without this state unless its total operations earned a net income.

In addition to the statutory provisions above quoted, we turn to § 110-1507, which says:

"(a) If the gross income of a corporation is derived from business done both within and with-

out the state, the determination of net income shall be based upon the business done within the state, and the commission shall have power to permit or require either the segregated method of reporting or the apportionment method of reporting, under rules and regulations adopted by the commission, so as fairly and accurately to reflect the net income of the business done within the state.

"(b)    The provisions of subsection (a) dealing with the apportionment of income earned from sources both within and without the state of Oregon are designed to allocate to the state of Oregon on a fair and equitable basis a proportion of such income earned from sources both within and without the state."

We believe that the section just quoted does not mention "gross income" and "net income" for the purpose of indicating that an assessment of the corporation excise tax is dependent upon the existence of an over-all net income, but because Oregon business may be so intermingled with the corporation's total volume that resort will have to be had either to the segregated method or an allocation formula before the net income earned by the Oregon business can be ascertained.    Therefore, § 110-1507 authorizes the tax commission to employ either of those methods to unravel from an over-all business the Oregon business, and from gross net income the local net earnings.

The corporation excise tax was created by 1929 General Laws of Oregon, Ch. 427.    Section 110-1507 is an amended form of § 7 of the 1929 act, which read as follows:

"Allocation.    If the gross income of a corporation is derived from business done both within and without the state, the determination of the net income shall be based upon the business done within

the state and the commission shall adopt such recommendations and regulations as will fairly and accurately reflect the net income of the business done within the state."

Chapter 273, § 5 of 1931 Oregon Laws, substituted the word "rules" for the term "recommendations" found in the original act. Chapter 489, § 3, 1939 Oregon Laws, again amended § 7 of the original act. The amendment of 1939 placed § 7 into the form in which it now appears as § 110-1507, O. C. L. A.

It will be seen from the foregoing that from the outset § 7 has said that if the gross income of a corporation is derived from business done both within and without Oregon, "the determination of the net income shall be based upon the business done within the state." Those words indicate that the base of the tax assessed against corporations which do business both within and without this state is not their over-all net income, as the plaintiff's argument insists, but their "business done within the state", that is, within Oregon.

The title of the 1929 act said:

"To provide for an excise tax upon * * * manufacturing and business corporations; * * * to define 'net income'; * * * to provide for allocation of business done within and without this state; * * *."

The phrase last quoted, that is, "allocation of business done within and without this state", is adverse to the plaintiff's contention that the tax is based upon over-all net income, and is in harmony with the idea that the basis of the tax is the business done in Oregon.

It is manifest that the corporation excise tax imposed by the above statute is a privilege tax. It is

the price exacted from corporations for the privilege of doing business in Oregon; in truth, for the privilege of earning a net income in this state. The statute itself clearly so states; for instance, § 110-1506 says:

"Every * * * corporation doing or authorized to do business within this state, * * * shall annually pay to this state, for the privilege of carrying on or doing of business by it within this state, an excise tax according to or measured by its net income, * * *."

Section 110-1507, which deals specifically with corporations whose businesses are similar to the plaintiff's, that is, done both within and without Oregon, in setting forth how much such corporations must pay, says:

"The determination of net income shall be based upon the business done within the state."

Net income earned in this state is not dependent for its economic value upon results achieved in other states. A dollar earned in this state is of equal value whether it swells income or diminishes a loss incurred elsewhere.

When it is seen that the excise is a privilege tax and that the amount exacted from corporations such as the plaintiff is based "upon the business done within the state", or, to be more specific, upon the "net income" earned in Oregon, it is easier, so we think, to determine which of the two above propositions was embraced by the draftsmen of the act. Since the tax is exacted for the privilege of earning a net income in this state, the losses or profits resulting from operations in other states are immaterial. If the act means that no tax shall be assessed unless the corporation made an over-all net income, even though its Oregon business yielded

a profit, then we have a construction that is incongruous with the refrain that runs all through the act; that is, that the tax is a privilege tax. Such a construction would be hostile to the provisions which state that the tax is dependent upon "the business done within the state * * * measured by its net income." Likewise, it would be hostile to the other provisions which say:

> "* * * the determination of net income shall be based upon the business done within the state, * * * under rules and regulations adopted by the commission, so as fairly and accurately to reflect the net income of the business done within the state."

Upon the other hand, if the act means that a tax shall be levied upon the Oregon net income, even though operations in other states incurred a loss, then we have an interpretation in harmony with the fundamental principle of the act: the tax is a charge for the privilege of earning a net profit in this state.

The manner in which the interpretation urged by the plaintiff would do violence to the measuring stick set forth in the act may be more clearly seen if one takes as an example a corporation whose Oregon business resulted in a loss, but whose business done in other states yielded an over-all profit. Under the plaintiff's interpretation, the defendants would be authorized to allocate to this state a part of the corporation's over-all net income and then assess a tax based upon it. Such a tax would be at variance with the principle that the amount exacted is payment for the privilege of earning a net income in this state.

The above is not all that throws light upon the construction of the act. The sections upon which the

plaintiff depends are general in their phraseology and are intended to apply generally to all corporations. The purpose of those sections is to say that the corporation excise tax is to be graduated according to net income. Seemingly, when the draftsmen wrote those sections they had in mind corporations which confine their business to Oregon. In § 110-1507 they made specific provision for corporations which do business both within and without this state. Accordingly, although they had defined the term "net income" in § 110-1506, they restated in § 110-1507 the meaning which they wished applied to corporations which do business both within and without this state. For application to such corporations, they said:

"* * * the determination of net income shall be based upon the business done within the state, * * *."

They did more; they added:

"* * * and the commission shall have power to permit or require either the segregated method of reporting or the apportionment method * * * so as fairly and accurately to reflect the net income of the business done within the state."

It seems manifest that if the general definition of the term "net income", as given in § 110-1506, could mean that corporations doing business both within and without this state should not be liable for a tax unless their over-all business yielded a net income, that meaning is repelled by § 110-1507, which, as we have seen, says:

"Net income shall be based upon the business done within the state * * * to reflect the net income of the business done within the state."

Those words carve out of the total volume of business done by any corporation, with which § 110-1507 specifi-

cally deals, its Oregon business and confines the significance of "net income" to the local business.

■ This court has many times employed the rule that if a statute contains general terms which are inconsistent with a part of the act dealing specifically with a particular group, the specific provisions control and are given effect. See, by way of illustration, *Hill v. Hartzell,* 121 Or. 4, 252 P. 552; *Barnes v. Massachusetts Bonding Co.,* 89 Or. 141, 172 P. 95; and *Home Telephone & Telegraph Co. v. Moodie,* 75 Or. 117, 145 P. 635.

We know of no reason why the rule of statutory construction just stated should not be employed in the present instance. Section 110-1507 is specific in nature. It is applicable to corporations with businesses similar to the plaintiff's; that is, enterprises conducted both within and without this state. The parts of the act upon which the plaintiff depends are general in nature.

■ For the reasons stated above, we believe that every corporation which earns a net income in this state is subject to the assessment of the corporation excise tax, even though the business which it did elsewhere caused it to sustain an over-all net loss. Our reasons, succinctly stated are: (1) The corporation excise tax is a privilege tax based upon net income earned in this state; and (2) the provisions of § 110-1507 deal with the particular subject of corporations which do business both in Oregon and elsewhere, and since that section says "net income shall be based upon the business done within the state", those words, and not the general definition of "net income" found in § 110-1506, control in cases like the present.

We shall now consider the second of the above-stated issues presented by the plaintiff. Without waiv-

ing the issue of which we have just disposed, the plaintiff contends that the complaint shows that the Continental Coal Company stock was such an indivisible part of its business that the defendants should have apportioned against the profits which they allocated to Oregon in 1940 a part of the loss which the plaintiff sustained when the coal company stock became worthless. The finding entered by the defendants upon this issue follows:

"The stock was not employed as an integral part of the activity in Oregon and had no situs for tax purposes here."

■■ Normally, a determination as to the character of the ventures conducted by a corporation that is, whether they were unitary or otherwise in nature, is a question of fact and not of law. Section 110-1522, subd. (i), O. C. L. A., is the part of the corporation excise tax statute which authorizes judicial review of the orders entered by the tax commission. That section says, in part: "Such review shall proceed in the manner of a suit in equity." We have deemed the statute as meaning that the review goes beyond a determination of whether errors of law were committed by the commission, and includes a determination as to whether its findings of fact are supported by substantial evidence. *Weyerhaeuser Timber Co. v. Galloway,* 168 Or. 85, 121 P. (2d) 469. However, since the facts are submitted to us under a demurrer to the complaint, the sole issue which we can determine is whether or not those facts show that, as a matter of law, the defendants should have held that the plaintiff's ventures, including its ownership of the coal company stock, were unitary in character.

Section 110-1507 does not employ the word "unitary", but the duty of the defendants to determine whether a corporation which produces income both within and without Oregon is unitary or multiform is implied. The section, as we have already indicated, uses the term "segregated method" and "apportionment method." Before either of those methods can be employed, the question must first be answered whether the business is unitary or otherwise in character.

■ Every definition of the word "unitary" must of necessity be general, and since such must be its nature, a repetition of definitions cannot be helpful in the solution of any specific problem. In determining whether a business is unitary or otherwise in character, a knowledge of the facts is essential; in truth, the facts are all important. For instance, in determining whether or not two or more ventures conducted by a corporation are divisible or unitary, one might learn much about their nature by consulting the corporation's account books. If the books intermingle the income produced and the expenses incurred by the several ventures, a conclusion would possibly be warranted that the enterprises were a single unit. At any rate, as opposed to the inconvenience of segregating the ventures, one might prefer to deem the business as unitary. Upon the other hand, if a separate set of books was kept for each venture, and if overhead was apportioned to each, it may be that the corporation's business would be deemed divisible. In other words, collateral facts, in addition to the nature of the undertaking, may be entitled to consideration. The determination of the nature of a business enterprise is essentially a practical matter. Much must be left to the sound business sense of

the tax commission. Fortunately, the passage of time gains for the commissioners the accession of experience and out of the latter there frequently develops expertness. It is the fact that findings, such as the one which the plaintiff now attacks, were written by men whose judgment was buttressed by experience which entitles such findings to be accorded a high degree of respect when attacked in a judicial proceeding.

By reverting to our review of the complaint, it will be observed that there is absent from it an averment that the plaintiff has set forth all information pertinent to the nature of its enterprises that is available. In fact, the complaint does not say that it recites all the facts upon which the defendants acted when they held that the business was not unitary. The complaint discloses nothing concerning the bookkeeping methods employed by the plaintiff.

It will be recalled that the defendants deemed the plaintiff's business as dual in character. Into one unit they placed the plaintiff's ownership of the Continental Coal Company stock, and deemed as the other unit all of the remainder of its business. The latter unit consisted of industrial enterprises which may be described as lumbering, provided that term is understood as including the extensive operations which are today pursued by the larger concerns engaged in the lumber business. This unit purchased, sold and owned timber lands, conducted logging operations, manufactured timber products and sold the products of its mill. It included the capital stock of a subsidiary of the plaintiff which was engaged in the ownership, development, rental and sale of real property at Hines where the plaintiff's mill was located. It dealt, as a wholesaler, through the medium of another subsidiary, in the prod-

ucts of other sawmills. The plaintiff does not contend that those business pursuits are not related and suitable for treatment as a unit. Therefore, we shall bestow no further attention upon that phase of the plaintiff's business. The plaintiff, however, urges that its coal company stock should be deemed a part of the unit just described. We have quoted the defendants' finding that the coal company stock "was not employed as an integral part of the activity in Oregon" and also every averment of the complaint which challenges that finding.

The specific part of the plaintiff's brief which attacks the finding just quoted is:

"As alleged in Par. V(c) of the complaint the lands and property which were originally transferred to Continental Coal Company for stock were held for sale in the ordinary course of business and were, therefore, not capital assets. Surely this particular block of stock did not become a capital asset. It was only the substitute for property held for sale in the ordinary course of business upon which eventual gain or loss had not been realized. Respondents would not contend, we are sure, that this particular block of stock was a capital asset if gain rather than loss had resulted from its disposition. The amount of loss, namely, $889,197.06, which resulted from loss on stock received in exchange for property held for sale in the ordinary course of business, is sufficient to eliminate all of appellant's income for 1940 without consideration of the loss on the part of said stock which was obtained by purchase."

Thus, the plaintiff argues that its 58,724 shares of stock in the Continental Coal Company, and worth, prior to 1940, $4,093,308.27, should have been deemed by the defendants an indivisible part of the lumber unit.

The complaint, as we have said, describes the Continental Coal Company as "an operating coal company." By reverting to Paragraph V(c) of the complaint, which is quoted in a preceding paragraph, it will be seen that in 1930 the plaintiff acquired $889,-197.06 of the coal company stock through "the transfer of coal mining lands and property owned by the plaintiff and held by it for sale in the ordinary course of its business." According to subdivision (a) of Paragraph V, the plaintiff acquired, prior to January 1, 1929, $395,418.34 of the coal company stock through "an exchange of preferred stock and bonds of the Continental Coal Company" which it had previously obtained "in exchange for coal mining lands and properties held by the plaintiff for sale in the ordinary course of its business."

The two blocks of stock just mentioned aggregate $1,284,615.40 in value. The total of all the stock owned by the plaintiff in the Continental Coal Company was $4,093,308.27. All of it, with the exception of the two blocks just mentioned, was acquired by the plaintiff through cash transactions. The plaintiff seems to believe that since its complaint alleges that the two blocks just mentioned had their origin in transactions arising out of "coal mining lands and property owned by the plaintiff and held by it for sale in the ordinary course of its business," therefore, all of the corporate stock should have been viewed by the defendants as though it were coal mining lands held by the plaintiff for sale in the ordinary course of its business. So far as can be ascertained from the complaint, the plaintiff, although it owned virtually all of the stock for more than ten years before the tax was assessed, sold none of it, and it is not alleged that the Continental Coal Company

sold any of its coal lands. From the fact that that concern is described as an "operating coal company," the inference would seem warranted that the plaintiff held the 58,728 shares as an investment. The complaint alleges, in words already quoted, that the plaintiff's business "in states other than Oregon consisted of * * * and investment property * * *." It may be, in absence of any averment to the contrary, that the investment items consisted of the Continental Coal Company stock.

When the plaintiff instituted this proceeding in order to obtain a judicial review of the action taken by the defendants, it assumed the burden of alleging and eventually of proving that the defendants acted arbitrarily when they refused to deem the plaintiff's business as indivisible and unitary. *Butler Bros. v. McColgan*, 315 U. S. 501, 62 S. Ct. 701, 86 L. Ed. 991, and *Maxwell v. Kent-Coffey Mfg. Co.*, 204 N. C. 365, 168 S. E. 397, 90 A. L. R. 476, affirmed in 291 U. S. 642. The complaint should have pointed out wherein the defendants' challenged ruling was arbitrary and unwarranted by the facts. That pleading nowhere charges the defendants with arbitrary or capricious action. There is no allegation in the complaint that the ownership of the coal company stock was interwoven with the plaintiff's other operations or that it in any way contributed to or facilitated the transaction of the plaintiff's lumbering business. In fact, the complaint does not go so far as to allege that the plaintiff's business is unitary, indivisible or homogeneous. There is nothing in that pleading to repel the inference that naturally comes to mind that ownership of stock in an operating coal company cannot be indivisibly connected with a sawmill business. The

averment made by way of recital that the plaintiff received some of the coal company stock in exchange for coal lands cannot amount to an allegation, notwithstanding the plaintiff's insistence to the contrary, that when the plaintiff received the stock it thereby became involved in operations centering in the sale of coal lands. The direct opposite is the only inference that naturally comes to mind.

Since the complaint avers that a part of the plaintiff's business in states other than Oregon consisted of holding investment items, the only permissible inference to be drawn from the averments concerning the coal company stock is that those securities constituted the investment items. The plaintiff itself concedes that intangibles of that kind, not related to business conducted in this state, have their taxation situs at the plaintiff's domicile. Therefore, the coal company stock was properly excluded by the defendants in the assessment of the plaintiff's excise tax.

Without further analysis, we express our conclusion that the complaint wholly fails the purpose which the plaintiff has in mind. It does not state a cause of action. The demurrer was properly sustained. The decree is not erroneous.

It follows that the decree of the circuit court was properly entered and that it must be sustained.