Argued October 27, 1958, affirmed in part, reversed
in part March 4, 1959

# EDWARD HINES LUMBER CO. *v.* STATE TAX COMMISSION

336 P. 2d 75

454

*Ralph R. Bailey* and *Bernard Shevach,* Portland, argued the cause for appellant. On the briefs were Bernard Shevach and Maguire, Shields, Morrison & Bailey.

*Carlisle B. Roberts,* Salem, Assistant Attorney General, argued the cause for respondents. With him on the brief were Robert Y. Thornton, Attorney General, and Donald J. Griswold, Assistant Attorney General, Salem.

Hart, Davidson & Veazie, Portland, filed a brief as Amici Curiae.

Before PERRY,* Chief Justice, and WARNER, MC-ALLISTER,** SLOAN and O'CONNELL, Justices.

---

\* Chief Justice when case was argued.
\*\* Chief Justice when this decision was rendered.

PERRY, J.

The plaintiff, the Edward Hines Lumber Co., brought two suits in the Circuit Court of the State of Oregon for Harney County to recover moneys claimed as refunds arising from an alleged overpayment of taxes for the years 1948 and 1949. The suits were consolidated for trial. The trial court entered a decree for the defendants and the plaintiff has appealed.

For the purposes of this opinion we will refer to the defendants as the Commission.

It is stated in the Commission's brief that "The defendants are in substantial agreement with the statement of facts contained in plaintiff's brief," and, while the statement of facts contained in plaintiff's brief contains some conclusions and a statement of the issues to be determined, these conclusions are noncontroversial and we, therefore, set forth and adopt this statement of facts, which is as follows:

## STATEMENT OF THE CASE

The plaintiff, a corporation organized and existing under the laws of Delaware, is authorized to do business in various states, inclusive of the State of Oregon. In Oregon, the business activities of the plaintiff consist in part of sawmill operations at Hines, Harney County, Oregon, and at Westfir, Lane County, Oregon. To the Hines sawmill the plaintiff cuts and transports logs from timberlands owned by the United States Government and located in Harney and Grant counties, Oregon, save and except for a minor portion of logs cut and removed from lands privately owned; to its Westfir sawmill the plaintiff cuts and transports logs from timberlands owned by the United States

Government and located in Lane County, Oregon. Substantially all of the lumber so manufactured in Oregon is sold and shipped to customers who are in a large and substantial proportion located outside of the State of Oregon. In addition to the lumber it manufactures in Oregon, the plaintiff buys and sells lumber from an office it maintains in Portland, Oregon. As previously indicated, the sale of lumber to Oregon customers is small.

Outside of Oregon, the plaintiff conducts extensive business activities. Matters of corporate administration are conducted from the head office located in Chicago, Illinois. In Illinois, the plaintiff also maintains and operates retail lumber yards. In various states of the nation, inclusive of Oregon, the plaintiff is engaged in the prime activity of buying lumber and selling the purchased lumber, together with the lumber it has manufactured in Oregon, on a nation-wide basis. Because of the nation-wide selling activity, the plaintiff conducts a nation-wide marketing organization with sales offices located in cities throughout the United States.

The plaintiff is not primarily a producer and manufacturer of lumber. The fact is that it purchases a greater quantity of lumber in Oregon and other states for purposes of sale than it manufactures in Oregon through its logging and sawmill operations.

Since the plaintiff engages in multi-state operations, the segment of business activity occurring in a given state results in net profit and income to the plaintiff only when added to the business activity occurring in other states. In short, it is clear that all profit from the sale of a wood product may not be relegated to the state in which the product was only manufactured or purchased, since a sale is essential

to the realization of profit; it is also clear that all profit may not be relegated to the state in which the product was only sold, since a sale could never have been consummated unless the product was first acquired either through manufacture or purchase. The segment of income properly attributable to Oregon from the sale of a wood product can be apportioned to Oregon, and the remainder of the income from the sale properly attributable to other states can be apportioned to these other states only by the device of a formula which will equitably divide the income among the various states in which the income producing activity occurred.

Oregon has such a formula. The plaintiff being a multi-state manufacturing corporation, the corporate excise tax regulations promulgated by the Oregon State Tax Commission basically assume that the factors responsible for the production of income in Oregon are the property of the manufacturer located in Oregon, the employees working in Oregon, and the sales made in Oregon. By a parity of reasoning, the Oregon regulations assume that these same factors are responsible for the production of income in the other states of corporate activity. Accordingly, in the case of a multi-state corporation, the percentage of total income properly apportionable to Oregon would be the same as the percentage of the total of the income-producing factors located in Oregon. Hence the formula is computed as follows:

A three-factor formula consisting of the aforesaid income-producing factors, namely, property, wages (which measure the extent of employee activity) and sales, is employed. Included in the property factor are the real property and tangible personal property owned and used, or rented or leased and used by the

taxpayer corporation, and the Oregon property factor is represented by the percentage which the average value during a tax year of said real and tangible personal property located in Oregon bears to the average value during the same tax year of the aggregate real and tangible personal property located in all states, inclusive of Oregon. Included in the wage factor are wages, salaries and other compensation for personal services paid to employees, and the Oregon wage factor is represented by the percentage which the wages paid to employees in connection with the business conducted in Oregon in a tax year bears to the aggregate wages paid to all employees in connection with the business conducted in all states, inclusive of Oregon. Included in the sales factor are sales of product and charges for personal service, and the Oregon sales factor is represented by the percentage which the sales of product and charges for personal services made in Oregon in a tax year bears to the aggregate sales of product and charges for personal services made in all states, inclusive of Oregon. The three aforesaid percentages are added and the total is divided by three, and the resultant average percentage is then applied to the total corporate net income derived from all states, inclusive of Oregon. The dollar figure arrived at by this method of computation constitutes the net income taxable by Oregon.

In 1948 and 1949, the right of the plaintiff to cut and remove timber from Government owned lands existed under timber cutting contracts entered into between the plaintiff and the United States Forestry Bureau. These same contracts imposed upon the plaintiff the obligation to construct such roads and railroad bed as were necessary for log removal. The logging roads so constructed are constructed to the same stand-

ards as public highways, and have a heavy use by trucks and by the motoring public. On the return filed by the plaintiff for the tax year 1948, there was included in the property factor for the purpose of apportioning income to Oregon, the average unamortized cost to the plaintiff of the construction of these logging roads and railroad bed which were located on lands owned by the United States Government and on privately owned lands. The plaintiff did not include this unamortized cost in its property factor for the year 1949, because of the fact that the plaintiff, after study of the issue, decided that the requirement of inclusion by the Oregon State Tax Commission was erroneous. Thereafter the State Tax Commission recomputed the tax on plaintiff's 1949 return by including the cost in the property factor.

The inclusion of the logging roads and railroad bed in the property factor caused an increase in the amount of income apportioned to Oregon, with the consequence that the tax payable for the years 1948 and 1949 was greater than the tax which would have been payable if the roads had been omitted from the property factor. Disagreeing with the basis of the added tax assessment, the plaintiff paid the added tax and then filed refund claims with the Tax Commission for the added tax so paid for each of the years 1948 and 1949.

Following is the reason why both the Oregon income and Oregon tax are greater because of the logging road and railroad bed inclusion in the property factor:

The average unamortized cost to the plaintiff in 1948 of its logging roads and railroad bed was computed by adding the unamortized cost on December 31, 1947, to the unamortized cost on December 31, 1948,

and by dividing this sum by 2. The average unamortized cost to the plaintiff in 1949 of the logging roads and railroad bed was similarly computed by adding the unamortized cost on December 31, 1948, to the unamortized cost on December 31, 1949, and by dividing by 2. The unamortized cost of the logging roads and railroad bed on each of the aforementioned dates consisted of the total original cost of construction prior to said date, less the portion of the total original cost which had been written off prior to said date. The write off of the total original cost was taken prior to, during and subsequent to the years 1948 and 1949 on the basis of the percentage that the total footage of timber cut and removed over the roads and railroad bed each year was of the total footage of timber to be cut and so removed over the roads and railroad bed during the period of use thereof by the plaintiff.

Virtually all of the logging roads and railroad bed constructed by plaintiff were located in Oregon, as is borne out by the following data:

### For the year 1948

Average unamortized cost of logging roads and railroad in Oregon for the year 1948 ............................................................$690,978.55

Average unamortized cost of logging road and railroad in all states, inclusive of Oregon, for the year 1948 .....................$744,733.31

The percentage relationship of $690,-978.55 to $744,733.31 reveals that over 92 percent of the total average unamortized cost was located in Oregon.

### For the year 1949

Average unamortized cost of logging roads and railroad in Oregon for the year 1949 ............................................................$693,301.74

Average unamortized cost of logging roads and railroad in all states, inclusive of Oregon, for the year 1949 ............................$739,952.98 The percentage relationship of $693,-301.74 to $739,952.98 reveals that over 93 percent of the total average unamortized cost was located in Oregon.

From the above facts, it is clear that the plaintiff's Oregon property factor percentage is increased by the road and bed inclusion, since practically all of the road and bed value is in Oregon and only a small percentage of the value is in the other states. At this point it is well to mention that the steel rails on the railroad bed are in the property factor, and the propriety of this inclusion is not contested by the plaintiff.

The Commission denied the refund claims filed by plaintiff for both 1948 and 1949 and the denials were sustained by the Circuit Court for the County of Harney to which the plaintiff appealed. From the judgment of the Circuit Court an appeal is taken to the Supreme Court. Accordingly, one of the issues to be decided here is whether or not the unamortized average cost of the logging roads and railroad bed constructed by the plaintiff in all states, inclusive of Oregon, may properly be included in the property factor employed by the Oregon State Tax Commission for the purpose of apportioning to Oregon its share of the taxable net income of a multi-state corporation.

Following are the salient facts relative to the ownership, control, supervision and use of the roads and railroad bed:

I. Road Ownership:

Seventy-four percent of the logging roads and railroad bed involved in this case were constructed, and, at all times since construction, were and now are lo-

cated on lands owned by, and with absolute title vested in, the United States Government, and were and are under the jurisdiction of the United States Forestry Bureau, Department of Agriculture, or under the jurisdiction of the United States Bureau of Land management, Department of the Interior. All of the logging roads, whether on Government or privately owned land, from the date of construction were and now are regarded as Government owned roads. At the termination of the contracts between the Forestry Bureau and the plaintiff, all of the roads and bed remain in the absolute ownership of the United States Government as part of the national forest system of road. Additionally, in the case of the roads and bed constructed on privately owned land, all easements, rights of way and fee rights in the land acquired by plaintiff become Government owned property at the end of the contract.

II. Supervision of the Roads:

The contracts between the Forestry Bureau and the plaintiff provided that the roads and railroad bed should be constructed and maintained subject to the rules and regulations promulgated by the Forestry Bureau for the protection of the national forests. Under the contracts the clearing of all rights of way are required to be done in accordance with the requirements of the Forestry Bureau and in a manner satisfactory to the Forest Supervisor. The main roads are required to be constructed following a route as staked in advance by an officer of the Forestry Bureau, or as approved in advance by the officer; the roads must be constructed in accordance with the specifications of the Forestry Bureau as to width, grade, curves, surfaces, culverts, bridges, drains and other specifications, and must be constructed so as to prevent erosion and

other damage to Government property, to the satis-
faction of the Forestry Bureau; no road may be altered
as to route, and no culverts or bridges in place may
be removed, without the consent of the Forestry Bu-
reau; and at all times during the period of use the
roads must be maintained to a standard which is satis-
factory to the Bureau. During the construction of the
roads and railroad bed in issue, the fact is that the
Forestry Bureau exercised iron-handed control with
constant supervision and directives concerning the
road grade and surfacing, location and installation of
culverts, piling and disposing of brush, erosion pre-
vention, and other relevant matters. After the roads
were constructed the further fact is that they were
inspected almost daily by a forest ranger, and all de-
ficiencies cited by him were remedied by the plaintiff.
By reason of the Forest Department contracts, the
same measures of supervision and control were as-
serted over the roads on privately owned lands as
were asserted over roads on publicly owned lands.

III. Use and Control:

All of the logging roads in this appeal were during
the years 1948 and 1949 and now are open to use by
the public as Government owned roads. The plaintiff
does not have the authority to exclude the public from
road use, but such authority is vested in the Forestry
Bureau. Exclusion of the public from road use has
never been invoked by the Forestry Bureau on any
of the roads in Harney and Grant counties wherein
69.6 miles of logging road are located. Of the 27 miles
of logging road located in Lane County, approximately
15 miles have been closed by the Forestry Bureau for
a period of three to five months in the summer season
because of high fire hazard conditions. When the
public is excluded from road use by the Forestry

Bureau, persons other than personnel connected with logging operations can use the road only by obtaining a Bureau permit. The portion of the roads located on private lands form an integral part of the roads which are located on Government lands and are necessary parts of the road system used in logging Government timber. Accordingly, the roads on private land are equally affected with the roads on public land by the control over road use held by the Forestry Bureau. In the contracts entered into between the plaintiff and the Forestry Bureau, as in the case of any party who contracts to purchase Government timber, the Forestry Bureau reserves, as it still does, the sole right to grant to other logging contractors permission to use the same roads as plaintiff for the purpose of cutting and removing Government timber, and no such other logging contractor could use the roads for said use without such permission. At the termination of the contracts between the Forestry Bureau and the plaintiff, the rights of the plaintiff in and to the use of the roads and railroad bed ceases absolutely, and any subsequent usage is dependent upon obtaining a permit from the Forestry Bureau. The actual use of the roads constructed by plaintiff in the Ochoco and Malheur national forest areas, which supply the mill at Hines, Oregon, is as follows:

On Main Road No. 1 alone, extending into the Ochoco national forest, in the year 1950, between the hours of 7:30 a. m. and 4:30 p. m., for the four-week period comprising the hunting season, an actual count of approximately 1000 automobiles was made. For each of the years 1948 and 1949, approximately the same number of automobiles used the road during the hunting season. This public usage has increased, as is manifested by the fact that over 2500 automobiles

used the road during the hunting season in the year 1955. Outside of the hunting season, and for the approximate period of five months in the summer, approximately forty to fifty cars a week used the road during the years 1948 and 1949. In addition to recreationists, there were grazing permittees who were grazing sheep and cattle in the Ochoco national forest during 1948 and 1949, with approximately fifteen permittees using plaintiff's roads. Approximately 65 cattle grazing permittees were using plaintiff's roads in the Malheur national forest during 1948 and 1949. The use of the roads by the grazing permittees consisted of driving their cattle down the roads and of transporting themselves and their horses over the roads in the course of supervising their cattle. Cattle shipments to market were made over the roads and trucks were used for their transport. In the Ochoco and Malheur national forests, there were seven or eight inhabitants who used plaintiff's roads and during the winter months the roads were traveled by persons seeking Christmas trees. The Forestry Bureau maintained camp grounds in the forests in 1948 and 1949 and plaintiff's roads were used by the campers, since the roads furnished the sole access to the grounds. In the Ochoco national forest, the boy, girl and cub scouts have a cabin on Delintment Lake which is a recreational and fishing center. All vacationists seeking this area use plaintiff's road.

The actual use of plaintiff's road in Lane County is the following:

For a period of approximately 26 weeks of the year an average of 50 cars a week used the roads, with intermittent usage the balance of the year. There was a private residence on the Salmon Creek road area on a Forest Service-leased section of land. In the same

area, Southern Pacific Railroad and the City of Oakridge had a water intake which was serviced regularly and the Forest Service maintained a camp ground. Fishermen, campers, picnickers and other individuals constantly used the roads over a 26-week period, and the City of Oakridge and Southern Pacific Railroad used the roads over a 12-month period in connection with their water intake. Additionally, in the year 1949 one other logging contractor used the roads pursuant to Forest Bureau permission, in the year 1950 three other logging contractors used the roads, and since 1950 the numbers of other logging contractors continually using the roads has increased. In 1955, the plaintiff was not the major contractor on the Salmon Creek road, and in fact had only a minor volume of the timber transported over the road in 1955. Giustina Brothers in 1955 were using the roads as the major handlers of timber. In January of 1956, six to eight other logging contractors used the plaintiff's road system on a yearly basis.

Based upon the above set of facts, the first issue in this case is whether roads and railroad bed may be included in the plaintiff's property factor when they are essentially owned by the United States Government, when they are constructed under the complete supervision and direction of the United States Government, when they are controlled as to use exclusively by the United States Government, and when they are in fact used by the public as government owned roads, and used as logging roads by other logging contractors.

The second issue in this case relates to the validity of the method used by the Oregon State Tax Commission in applying the personal property tax offset to the Oregon corporate excise tax of the plaintiff.

The Oregon corporate excise tax is computed by

applying an 8 percent rate to taxable Oregon net income. If the corporate excise taxpayer has paid ad valorem taxes on its personal property to local governmental units within the State of Oregon, the amount of its corporate excise tax computed by applying the 8 percent rate may then be reduced or offset by deducting therefrom the said personal property taxes in an amount not exceeding 50 percent of the tentatively computed corporate excise tax. The balance represents the net corporate excise tax payable to the State of Oregon. In the case of corporations deriving income from Oregon and other states, the Oregon State Tax Commission devised a method of computing the personal property tax offset, which said method the plaintiff was constrained to follow on its 1948 and 1949 returns. Following is the method:

The entire net income, derived from all states, inclusive of Oregon, is computed. From this all-states net income the Commission method deducts the ad valorem personal property tax paid by the taxpayer to local units of government in Oregon. The net income remaining after the deduction is then subject to apportionment, and Oregon's share thereof is determined by applying to the remaining net income the three-factor formula previously described in this statement. After Oregon's share of income is so determined, the Tax Commission method adds back to this Oregon income the total personal property tax previously deducted from the all-states income. To this sum the 8 percent tax rate is then applied, determining the actual tentative tax; and the net corporate excise tax payable to Oregon is finally calculated by deducting from the tentative tax an amount of ad valorem personal property taxes locally paid, not exceeding 50 percent of the tentative tax.

The plaintiff contends that under Oregon law there may be neither a deduction of the ad valorem personal property tax from the all-states net income, nor may there be an addition of the ad valorem personal property tax to the income apportioned to Oregon. It is rather the plaintiff's position that the all-states net income subject to apportionment must be determined with no deduction of the personal property taxes paid, and that the income so apportioned to Oregon may not have added to it the personal property taxes paid. The tax computation should simply be made by applying the 8 percent rate to the Oregon net income without any previous deduction or addition of personal property tax whatsoever. The amount of tentative tax so computed should then be reduced or offset by deducting personal property taxes paid in an amount not exceeding 50 percent of the tentative tax in order to arrive at the true net payable excise tax.

For the years 1948 and 1949, the plaintiff filed its corporate excise tax returns using the Commission offset method. The plaintiff recomputed the net corporate excise tax, employing the method of offset consistent with its contentions. Since the plaintiff's method resulted in net corporate excise tax reductions for the years 1948 and 1949, refund claims for each year were filed with the Tax Commission. The claims were denied. From this denial an appeal was taken to the Circuit Court for the County of Harney where the denials were sustained. An appeal is made to this Supreme Court from the judgment of the Circuit Court.

Accordingly, the second issue presented in this appeal relates to the validity of the Tax Commission's method in its computation of the personal property tax offset as applied to a multi-state corporation de-

riving income from Oregon and other states, when the all-state corporate income is subject to apportionment by formula.

## OPINION

■ It must be kept in mind at all times that these taxes assessed against the plaintiff, and which are under consideration, are excise taxes levied upon plaintiff for the privilege of carrying on its business in the state of Oregon. The assessment of the tax rests upon determining the income of the plaintiff earned solely in the state of Oregon. *Hines Lumber Co. v. Galloway,* 175 Or 524, 154 P2d 539.

Therefore, the various factors and their component parts which make up the formula are not themselves taxed, but are used solely as a basis for the purpose of segregating from the total income of the plaintiff that portion considered as earned in the state of Oregon.

The Supreme Court of the United States, in referring to the use of a formula to determine the proportional part of the total income of a multi-state corporation attributal to the business carried on within a given state, stated:

"* * * The difficulty of making an exact apportionment is apparent and hence, when the State has adopted a method not intrinsically arbitrary, it will be sustained until proof is offered of an unreasonable and arbitrary application in particular cases." *Hans Rees' Sons v. No. Carolina,* 283 US 123, 51 S Ct 385, 75 L ed 879.

It seems clear that the words "unreasonable and arbitrary" as used in that opinion refer to a situation where the formula may demonstrate on its face or by application that its use clearly taxes the income of a

multi-state corporation earned elsewhere than in the taxing jurisdiction. If this appears, then the method adopted violates the Federal Constitution and cannot be sustained. *N. & W. Ry. Co. v. No. Carolina,* 297 US 682, 56 S Ct 625, 80 L ed 977; *Hans Rees' Sons v. No. Carolina,* supra.

██ It is not the contention of the plaintiff that the formula is clearly unreasonable and arbitrary, although the inclusion of the roads and railroad bed increase the tax payable, but rather (1) their inclusion violates the regulations of the Commission, (2) if it does not violate the regulations, it does violate the governing statute ORS 317.180, and (3) if authorized by the governing statute, then the statute to this extent is unconstitutional.

Plaintiff argues that the regulation which provides for inclusion of real property and tangible personal property in the property factor applies only to property which is "owned and used, or leased and used by the taxpayer."

The Commission argues that the predominating test of whether or not the property is to be included as a factor in the formula is whether or not it is something usable by the taxpayer for the production of income.

The regulations in question, so far as applicable, are as follows:

"APPENDIX A

"Oregon Corporation Excise Tax Regulations, 1946
"Art. 507.2. Apportionment Method

"*Apportionment factors.* After deducting the nonapportionable income the remainder should be apportioned to this state by giving equal weight to three factors:

"(1) The percentage that the average value during the taxable year of the real and tangible per-

sonal property used in the business within this state bears to the average value during the taxable year of such property used in the business both within and without this state; * * *

"The value at which tangible property should be included in the apportionment factor is the average of the depreciated cost, or other allowable basis, at the beginning and end of the taxable period; or at the end of each month during the taxable period. Tangible property includes land, building, machinery, stocks of goods, equipment, inventories, and other tangible personal property, actually used in connection with the production of apportionable income. Cash on hand or in banks, shares of stock, notes, bonds, accounts receivable, other evidences of indebtedness, special privileges, franchises and good will are excluded from the property factor. Property should not be included in the apportionment factor if the income from it is nonapportionable. * * *

"Oregon Corporation Excise Tax Regulations, 1955

"Reg. 7.180(1)-(B) Apportionment Method

"*Property factor.* The property factor shall be the percentage that the average value during the taxable year of the real and tangible personal property used in the business within this state bears to the average value during the taxable year of such property used in the business both within and without this state.

"For use in the property factor, the value of which real and personal property should be included is the average of its use value for income production. To reflect such income production values, appraisement values for insurance purposes may be permitted or required, if in the opinion of the commission such appraised values are the best indication of the income production values. Real and tangible personal property includes land, buildings, machinery, stocks of goods, equipment, inventories, and other real and tangible personal prop-

erty actually used in connection with the production of apportionable income. It is immaterial whether the property is owned or rented by the taxpayer. The test of its inclusion in the property factor is whether or not it is used or is capable of being used for the production of apportionable income. Accordingly, property under construction, unready for use in production, must be excluded.

"In determining the property factor, real property and tangible personal property rented or leased by the taxpayer, as well as real property and tangible personal property owned by it, used in the production of income, must be included in the property factor.

"In order to avoid unnecessary hardship on taxpayers and for ease of administration, the income production value of real property and tangible personal property, both within and without Oregon, which is rented or leased to the taxpayer, is determined by multiplying the gross rents payable during the tax period by eight.

"'Gross rents,' as used in this regulation, is the actual sum of money or other consideration payable, directly or indirectly, by the taxpayer or for its benefit for the use of the property and includes:

"(1) Any amount payable for the use of real property or tangible personal property, or any part thereof, whether designated as a fixed sum of money or as a percentage of sales, profits or otherwise. *Example:* A taxpayer, pursuant to the terms of a lease, pays a lessor $1,000 per month as a base rental and at the end of the year pays the lessor one percent of its gross sales of $400,000. Its gross rent is $16,000.

"(2) Any amount payable as additional rent or in lieu of rents, such as interest, taxes, insurance, repairs or any other amount required to be paid by the terms of the lease or other arrangement. *Example:* The taxpayer, under the terms of a lease, pays the lessor $12,000 per annum and also pays taxes in the amount of $2,000 and interest on the

mortgage in the amount of $1,000. Its gross rent is $15,000.

"(3) Where a building is erected on leased land at the expense of the lessee, which building reverts to the owner or lessor upon termination of the lease or other arrangement, the value of the building for inclusion in the property factor is ordinarily determined by dividing the Lessee's cost by the unexpired portion of the lease or other arrangement. The quotient is the gross rent paid by the taxpayer for the use of the building during the tax period. *Example:* The taxpayer enters into a ten-year lease, leasing certain unimproved premises at a rental of $5,000 per annum. After the expiration of one year, the taxpayer-lessee erects thereon a building which costs $90,000. This building, by the terms of the lease, reverts to the owner of the premises upon the expiration of the lease. Gross rent for the first year is $5,000. For subsequent years, the gross rent, for the purposes of apportionment, is $15,000 ($5,000 land rental plus $10,000, the quotient of $90,000 divided by nine.)

"'Gross rents' do not include:

"(1) Intercompany rents of both lessor and lessee when lessor and lessee are taxed on a consolidated return.

"(2) Amounts payable as service charges, such as utilities, janitor service, etc.

"(3) Amounts payable for storage, provided no designated space under the control of the taxpayer as a tenant is rented for storage purposes.

"In exceptional cases, use of the general method above outlined may result in inaccurate valuations. In such cases any other method which will properly reflect the value may be adopted by the State Tax Commission, either on its own motion or on request of the taxpayer. Such other method of valuation may not be used by the taxpayer until approved by the commission. Any such request shall set forth full information with respect to the property, to-

gether with the basis for the valuation sought by the taxpayer. Such other method, once approved by the commission, may be used by the taxpayer in its returns for subsequent years until the facts upon which such other method is based are materially changed."

While Regulation 7.180(1)-(B) came into existence subsequent to the commencement of this controversy, it is stated by the Commission that Article 507.2 was interpreted by the Commission as though it had been set out with the detail expressed in this later regulation.

There is no question but the use of property, both real and personal, for the production of income is a major factor sought to be evaluated in the regulations. Nevertheless, as shown by the exemption of certain property and rights from the regulations controlling the apportionment of the property factor, not everything that may aid in the production of income is intended to be included. While this fact alone is not controlling in itself, it is to be noted the regulations speak only of property owned, rented or leased.

It is, however, quite significant that, in addition to speaking of a taxpayer's property as owned, rented or leased, the regulations point out quite specifically the manner in which the "use value" of a property is to be determined. For instance, if the property, whether real or personal, is owned by the taxpayer, its use value is determined by appraisement of its tangible worth. If, on the other hand, the property is not owned, but is leased or rented, then the use value is determined by multiplying the rents paid in the taxable year by eight.

No place in the regulations is there any attempt to place the property factor upon purely a capital invest-

ment basis. (For a discussion of the reasons underlying rejection of the capital investment theory in the property factor see Allocation of Income in State Taxation, Altman and Keesling, 2d ed, p 110.)

It, therefore, must follow that, in addition to the use of property to create income, there must be a proprietary interest in or control thereof by the taxpayer of the property used if such property is to be included in the property factor under the Commission's regulations.

An examination of the facts in this case discloses no proprietary interest in or control of the roads and railroad bed, sought to be included, as contemplated by the regulations. At most, the plaintiff has a right, in common with the public, of ingress and egress over the lands of the Federal Government.

Having determined that this capital expenditure is not included in the Commission's regulations, it is not necessary to consider plaintiff's other contentions upon this issue.

The plaintiff's second contention is that the Commission's method of computing the excise tax due the state of Oregon is erroneous and the trial court, therefore, erred in decreeing the Commission's method proper.

Section 110-1506, OCLA, as amended by Oregon Laws 1949, ch 280, p 401, Section 1, is applicable to the years in controversy, and provides:

"Every * * * manufacturing * * * corporation doing or authorized to do business within this state, * * * shall annually pay to this state, for the privilege of carrying on or doing business by it within this state, an excise tax * * * to be computed * * * at the rate of 8 per cent upon the basis of its net income for the year 1931 and for each year thereafter. * * * Each cor-

poration mentioned in this section shall be entitled to an offset against said tax in the amount of taxes assessed to and paid by it upon its personal property located in this state. * * * For taxable years beginning after December 31, 1938, the offset shall not exceed 50 per cent of said excise tax."

This section also defines "net income" and "gross income" as follows, Oregon Laws 1949, supra, p 402:

"2. The term 'net income', as herein used, means the gross income less the deductions allowed.

"3. The term 'gross income', as herein used, includes gains, profits and income derived from the business, of whatever kind and in whatever form received; gains, profits or income dealings in real or personal property; gains, profits or income received as compensation for services; as interest, rents, commissions, brokerage or other fees, or other income of whatever character otherwise received in carrying on such business; all interest received on bonds, securities or other evidence of indebtedness, and all dividends received on stock including stock dividends, and all other income from money or credits."

Section 110-1508, OCLA (c) (6), as amended by Oregon Laws 1947, ch 257, p 325, Section (c) 6, provides that "Taxes upon personal property for which an offset is allowed under Section 110-1506, as amended," are not deductible from gross income.

Article 506-1 of the Commission's regulations provides in part as follows:

"No deduction from gross income is allowed for such personal property taxes in whole or part. See article 508-c-6."

Article 507-2 of the Commission's regulations provides:

"Whatever method of allocation is used, the net income properly attributable to Oregon must be

computed in strict compliance with the statute. Thus, since the statute does not permit the deduction of taxes imposed upon or measured by net income, or of personal property taxes on account of which an offset is allowed, no computation will be accepted which has the effect of reducing the net income allocated to Oregon on account of such taxes imposed by this or any other taxing jurisdiction."

Article 508-c-6 of the Commission's regulations provides:

"The statute does not permit a deduction from gross income for any part of the taxpayer's personal property taxes. See article 507-2. Subject to certain limitations, a direct offset against the excise tax is allowed for such taxes. See article 506-1."

As pointed out elsewhere in this opinion, the plaintiff's Oregon income is determined by formula. In reaching the amount of total net income earned in this state and the other states in which it operates, the gross income of the entire operation is first determined and from this amount there is deducted, in general, the cost of doing business in each of the states. This includes taxes such as the ad valorem tax upon personal property paid in each of the states, including that paid to the state of Oregon.

The formula is then applied to determine what percentage of this total net income should be considered earned in the state of Oregon, leaving the balance to be considered as earned elsewhere.

The Commission, in order to comply with its regulations and its interpretation of the taxing statutes hereinbefore set out, requires that there be added to the net income figure allocated to the state of Oregon all personal property taxes paid to the state if the offset allowance is applicable.

Assume plaintiff operates in only two states and has a gross income for both states of $200,000, that his total deductions, as allowed by statute, are $100,000, leaving him a net income, as defined by statute, of $100,000. By use of the formula, it is determined that the earned income in the state of Oregon is equal to that earned in the other state. The Oregon net income thus determined is $50,000. Further assume the plaintiff paid $10,000 in personal property taxes. This sum is then added to the net income arrived at by formula, creating a taxable income of $60,000, to which is applied the 8 percent tax, and after the tax is determined the statutory offset is applied.

Total gross income from both states......$200,000.00

Less deductions from both states ............ 100,000.00

Total allocable net income ....................$100,000.00

By formula apportionment 50 percent
    allocable to Oregon ............................ 50,000.00
    Net income ............................$ 50,000.00
    Property taxes paid ............ 10,000.00

Total taxable net income..$ 60,000.00

$60,000 × 8% equals $4,800.00 as the amount of excise tax payable before allowance of offset. The offset being limited to 50% of the excise tax is $4,800 less $2,400, leaving the net payable excise tax of $2,400.

The plaintiff contends this method of determining the net excise tax violates the statutes and regulations in that § 110-1506, OCLA, provides that "gross income can only be composed of gains received" and the use of the personal property tax as an item of income creates, in effect, taxable income out of the tax paid.

For example: There is included in the above demon-

stration the item of $10,000 paid as personal property taxes to the state of Oregon. This sum was first allowed as a deduction in arriving at the overall net income before the allocation formula was applied to determine the net income attributal to the state of Oregon. Thus:

| | | |
|---|---|---|
| Total gross income | | $200,000.00 |
| Overall deductions | $ 90,000.00 | |
| plus Oregon personal | | |
| property tax paid | 10,000.00 | $100,000.00 |
| | | $100,000.00 |
| 50% allocable to Oregon | | 50,000.00 |
| Net income | $ 50,000.00 | |
| Personal property tax | 10,000.00 | |
| Net taxable income | $ 60,000.00 | |

Plaintiff, by example, then argues that, since in determining the net income to which the formula was applied only 50 percent was allocated to Oregon, there was only deducted from the taxpayer's net income, subject to tax, 50 percent of the personal property tax declared non-deductible, and, therefore, the Commission, by using the entire amount of personal property tax as an item of taxable income, has created $5,000 of taxable income.

The question thus posed is whether or not the percentage of the multi-state taxpayer's net income allocated to the state of Oregon by formula must be accepted without addition or subtraction as the sole measure of plaintiff's earned income in the state of Oregon for excise tax purposes.

While it is argued in the brief of plaintiff and amici curiae that the addition of the personal tax

paid increases the taxable income of a taxpayer, it cannot be said that it creates income.

The gross income of a taxpayer is not increased, but the net income which is taxed is increased, because this cost of doing business within this state is not a deduction permitted by law.

The effect of the Commission's ruling is that, in addition to the amount shown to have been earned by this taxpayer in the state of Oregon by use of the formula, there was, in fact, other taxable income earned in the state which must be considered if a reduction in net tax liability is to be granted a taxpayer under the statute granting a direct reduction.

We believe it must be conceded that the formula method of determining earned income in a given state is at most only an approximation and not exact; it does not, therefore, appear that increasing the taxable income in Oregon by adding to the apportionment percentage figure the amount of personal property taxes to determine the taxable income of this plaintiff imposes a tax upon income earned by the plaintiff beyond the boundaries of this state and, therefore, we cannot say this procedure violates due process guaranteed under the Fourteenth Amendment of the Federal Constitution. *Butler Bros. v. McColgan,* 315 US 501, 62 S Ct 701, 86 L ed 991; *Underwood Typewriter Co. v. Chamberlain,* 254 US 113, 41 S Ct 45, 65 L ed 165.

The brief of Amici Curiae set forth examples which of course lead to absurdity, but this absurdity applies with equal effect to a domestic enterprise operating entirely within the state as to enterprises operating in this and other states. To establish this absurdity we will use the following example:

Assuming a business enterprise conducted entirely

within the state of Oregon has a gross income of $100,000. It has statutory deductible expenses, including $10,000 personal property taxes paid, of $100,000. It is apparent there is no net taxable income. But it is contended, since the $10,000 is not deductible from gross income, this $10,000 becomes net taxable income, thus the taxpayer is subject to a tax liability as follows: $10,000 × 8 percent equals $800, from which may be deducted the sum of $400, creating a tax liability of $400.

We think this erroneous conclusion arises from a misunderstanding and misinterpretation of the statutes. Section 110-1506, OCLA, as hereinbefore stated, creates the excise tax which we have been discussing. It also provides the taxpayer with a benefit offset of not to exceed 50 percent of the determined excise tax. The latter portion is granted as a benefit to the taxpayer and can be construed as placed in the statute for no other purpose. If, as set out in the preceding example, this portion of the statute would grant no benefit, it would have no application to this enterprise.

It seems clear to us that the beneficial portion of this statute only applies when it has the effect of reducing the taxpayer's ultimate tax liability to the state. To the same extent the proviso in § 110-1508, OCLA, as hereinbefore set out, would take effect only if a benefit in ultimate tax liability would result to the taxpayer from the application of the beneficial portion of § 110-1506, OCLA.

While it may be argued on strictly an accounting basis, that the Oregon net taxable income of a multi-state enterprise is increased by adding to income allocated to this state the amount of personal property taxes paid, if the statutory benefit is to be claimed, we are of the opinion this treatment of the multi-state

corporation is exactly the same as that of the wholly local business corporation that, for the purpose of determining whether or not the offset allowed would be beneficial, has first deducted the personal property taxes paid and finding the ultimate tax liability greater, if the offset provision is not allowed, is required, if it seeks this benefit of offset, to again add the amount of personal property to its net income figure.

We know of no rule of law, and none has been pointed out, to the effect that, when a state grants a privilege which will reduce the ultimate tax liability of a taxpayer, it may not fix the terms upon which it will grant the benefit.

It appears to us that § 110-1506, OCLA, which states the excise tax payable is "according to or measured by net income as hereinafter defined," followed by defining "net income" as "gross income less deductions allowed," is to be considered as in pari materia with the method of computing net income set forth in § 110-1508, OCLA. This later section prevents the deduction of taxes upon personal property where a direct offset against the excise tax liability is permitted. It, therefore, follows that whenever the privilege of the direct offset is sought then the personal property taxes paid must be considered as net income.

When these two statutes are considered together, it seems reasonable that the legislature intended that, whenever the privilege of a direct offset was allowable to reduce the ultimate tax liability of a taxpayer, the personal property tax paid in this state should be considered as income earned within the state upon which the assessment should be computed.

We, therefore, reach the conclusion that, where a benefit is to be granted the taxpayer as to his ulti-

mate tax liability, the state is not required to accept the multi-state taxpayer's net income determined by formula as the sole measure of income earned entirely within the state of Oregon.

This interpretation, which is in conformity with that of the Commission, does no violence to these statutes. Nor will this interpretation violate the equal protection of the laws mandated in the Fourteenth Amendment, for a multi-state corporation is treated upon an equal basis with the entirely domestic corporation. See *Madden v. Kentucky,* 309 US 83, 60 S Ct 406, 84 L ed 590, 125 ALR 1383.

The trial court did not err in denying plaintiff this particular relief sought.

The decree of the trial court is reversed in part and affirmed in part, and the cause is remanded to the trial court for entry of a decree consistent with this opinion.

Neither party shall recover costs in this court.

O'CONNELL, J., specially concurring.

I concur in the results but I do not agree with a part of the reasoning which relates to the application of the property factor in the allocation of income.

It is undisputed that the plaintiff has a right to cross certain lands of the federal government and certain lands of private parties, for the purpose of conducting its logging operations. Unlike the interest of members of the general public who use the roads, the plaintiff's right to cross these lands during the life of the contract was not revocable at the will of the federal government. Such a right is an easement. It is a property interest. The fact that the servient owner also has the privilege of using the way and the privilege of granting a similar use to others does

not make the dominate owner's interest any less an easement. Most easements are non-exclusive. In the absence of a manifested intention to the contrary, an easement is non-exclusive. An easement owner has a non-possessory interest in the servient estate. His right is to use, not to possess. In terms of control over the land subject to the easement his interest is slight. Nevertheless, the interest exists; it is a property interest; he "owns" that interest. The plaintiff has such an interest in this case and it uses it in the production of income. If it is to be excluded from the property factor, the reason for doing so must be on some other ground than the non-proprietary nature of the interest. The opinion states that "in addition to the use of property to create income, there must be a proprietary interest in or control thereof by the taxpayer of the property if such property is to be included in the property factor * * *" and it is then stated that "An examination of the facts in this case discloses no proprietary interest in or control of the roads and railroad bed sought to be included." The basis for this conclusion is not clearly stated. It is said that "the regulations speak only of property owned, rented or leased." But certainly an easement can be "owned," as much so as any non-possessory interest can be, and I am quite certain that the majority did not intend to exclude all such interests. The opinion then turns to the manner in which "use value" of property is determined and among other things observes that the regulations do not "place the property factor upon purely a capital investment basis." This is true, but it does not explain why the plaintiff's interest in the roads in this case is not property. In arriving at the value of property for the purpose of applying the allocation formula, it is very common to

accept as the equivalent of the market value the cost of construction less depreciation. Altman & Keesling, Allocation of Income in State Taxation (2d ed) p 115; Oregon State Tax Commission Regulations, Art 507(2) (1946), but cf. Reg 4.280(1)-(B) (1958).

If, in this case, objection to the inclusion of the roads in the property factor is based upon the method of evaluating the interest, then the evil can be corrected by using the proper method of evaluation.

The emphasis in the opinion on the fact that the logging roads in question were used by the general public is intended apparently to support the argument that the plaintiff had no interest in the roads distinguishable from the interest of others. This is not quite true because the roads could not be closed against use by the plaintiff except in unusual circumstances, such as periods of high fire danger, although they could be closed to the public. Furthermore, the argument that plaintiff's interest in the roads is not distinguishable from the general public's would not apply to the railroad right of way which the court holds is excluded also.

I have set forth my views as to the nature of the plaintiff's interest not because I think that by defining plaintiff's right in the roads as a property interest we solve the problem in this case, but because I feel that we should not invite future litigation in this field by improperly describing the nature of an interest in property.

I think that the logging roads should be excluded from the property factor for the following reasons. It is recognized by the tax commission that the plaintiff's investment in the roads is an investment in the timber purchased from the federal government. As counsel for the defendant states, "The investment in

the roads is as much an investment in the timber as is the purchase price of the timber itself" and that "This fact is also recognized by the Forestry Bureau as demonstrated by the fact that the appraised cost of the timber is reduced by the approximate amount of the cost of the road." The tax commission itself explains its position in this respect in the findings of fact contained in its opinion and order in this proceeding. There it is said:

"In determining the amount to be paid for government owned timber it is a common practice to allocate the purchase price of the timber in part to the timber and in part to any necessary roads which must be built in removing the timber. In other words, if the selling price of the timber is determined to be $15 per thousand and it is further determined that it will cost $3 per thousand to build a roadbed into the timber the selling price of the timber will be allocated, $12 per thousand to the timber and $3 per thousand to the roadbed. The roads so constructed are used by the taxpayer, and others similarly situated, to remove the severed timber from the show to the market.

"If another taxpayer were to purchase timber in the same area and, by reason of the existence of the access road built by Hines, it was unnecessary to build another access road, and it was determined that the value of the timber was still $15 per thousand, the taxpayer subsequently acquiring the timber would pay $15 per thousand for the timber with none of the purchase price being allocated to roads."

No significance should be attached to the fact that the timber is bought at the price set by the federal government or the price arrived at by competitive bidding because in either case the price reflects the cost of the road. The foregoing examples indicate quite clearly that the investment in the road was in effect a partial prepayment for the timber. Subsequent

payments made to the federal government by the plaintiff pursuant to the contract are not regarded by the defendant as an investment in tangible property real or personal but as a payment arising out of an intangible contract right to cut timber. As I understand the defendant's position, the plaintiff's interest in the road would not have been included in the property factor if the road had already been constructed at the time timber purchase was made, and as a part of the contract the plaintiff received the right to use the road. Thus, whether a logging road used by a taxpayer will or will not be included as an apportionment factor is made to depend upon a fortuitous circumstance and because it does I think that it reveals the essence of the transaction when the timber purchaser is required to construct the road. The investment required to construct the road is a part payment for timber. If the other payments for timber are not regarded as an investment in real or tangible personal property, it would seem to follow that the payment by way of road construction costs should be regarded in the same light. If, then, the defendant is faithful to its argument it would at least concede that its valuation of the road should not be predicated on the amount paid to construct it, but rather on the appraised value of the road to the plaintiff. If the plaintiff's interest in the road is evaluated on an appraisal basis, it is then pertinent to inquire whether the easement which the plaintiff has over the government lands should be regarded as having any greater value than the interest of other purchasers of timber from the federal government who, having bid the full price of the timber without a deduction for road costs, would not, as I understand the defendant's position, be regarded as having an interest in the road subject

to appraisal. In other words, if the easement which such other timber purchasers acquire to remove government timber would not be treated by the defendant as a species of property under the allocation factor, the plaintiff's interest should not be included when it is understood that the only difference between the two classes of purchasers is the happenstance that one pays for his timber with money and the other pays for his timber with money and roads.

I would, therefore, exclude the unamortized road costs from the formula.

McALLISTER, C. J., also concurs in this opinion.