# IN THE OREGON TAX COURT

## U. S. BANCORP et al,
*v.*
## DEPARTMENT OF REVENUE
(TC 1597)

Charles P. Duffy and Richard W. Miller, Duffy, Georgeson, Kekel & Benner, Portland, represented plaintiff.

Walter J. Apley, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered January 26, 1983.

## CARLISLE B. ROBERTS, Senior Judge.

The plaintiff appealed from the defendant's determination that additional tax assessments are due for tax years 1974 and 1975. The plaintiff alleged that Eurocom Data, Ltd. ("Eurocom"), was properly included in the plaintiff's combined returns for 1974 and 1975 Oregon excise tax because Eurocom and the plaintiff were engaged in a unitary business. In addition, the plaintiff contended that certain additions to the bad debt reserve of Commerce Mortgage Company ("Commerce"), a wholly owned subsidiary, were reasonable and should have been allowed as a deduction on its 1974 Oregon excise tax return.

*Unitary Issue.* In the consideration of the first issue, evidence revealed that Eurocom was involved in the business of marketing computer output microfilm, using a certain process, COMTREVE, which had been developed by U. S. Datacorp, a wholly owned subsidiary of the plaintiff with headquarters in Portland, Oregon. U. S. Datacorp had previously been involved in a number of ventures with banks in the United States which prepared it for the Eurocom venture with National Westminster Bank, Ltd., of London, England ("National").

Mr. Richard McCall, Executive Vice President and later President of U. S. Datacorp during the subject years, testified that there were seven ventures with seven different banks in the United States structured in a similar fashion to that of Eurocom. When questioned as to the percentage of interest which U. S. Datacorp held in these joint ventures with banks, the witness testified:

> "* * * [T]he initial capitalization was varied, however, it was oftentimes placed in kind on our part in terms of expenses of personnel, management, software and other items with an initial capitalization on the part of the bank. The general income was split and a — on a 50-50 basis, * * *." (Tr 20.)

Jim Stewart, a C.P.A. associated with the firm of Deloitte, Haskins & Sells, testified that he prepared the income tax returns for plaintiff and its subsidiaries for the years 1970 through 1975 and that U. S. Datacorp was always included for apportionment purposes in the plaintiff's combined return. Mr. Stewart explained that the reporting of income and losses of the domestic joint ventures were done in

a conventional way. If, in a venture agreement, Datacorp was a 25 percent partner, Datacorp would pick up 25 percent of the profits or losses of that venture. (Tr 41-42.)

When the plaintiff decided to expand Datacorp's computer service overseas, a joint venture was formed with National, in England, and Eurocom Data, Ltd., was created. National owned 75 percent and the plaintiff 25 percent of the voting shares of Eurocom. (Stip, at 5.)

Mr. Carl Mays, President of U. S. Bancorp, testified that the stock of Eurocom was owned equally by the parties with National holding 75,000 shares of the Class A stock (voting stock) and plaintiff holding 25,000 shares of Class B (voting stock) and 50,000 shares of Class C (nonvoting stock). The witness explained that the plaintiff subscribed for only 25 percent of the voting stock as a result of the Federal Reserve Board's Regulation K.

This regulation allowed banks to make investments without prior approval of the Federal Reserve Board if certain limitations, including ownership of no more than 25 percent of the common stock, were observed. Mr. Mays stated:

"* * * [I]t was clearly the intent for U. S. Datacorp to actually run and operate the company Eurocom.

"* * * * *

"And * * * that is exactly what happened. At the board meetings, the Managing Director, who was an employee of U. S. Datacorp, would report on operations to the board, would report on business development activity, would report and make recommendations on expansion strategy, and, in essence, control the day-to-day operation of the — of the company." (Tr 13.)

The Managing Director could not be replaced or dismissed without the prior written consent of both the plaintiff and National. (Stip, at 6.)

Mr. Bob Bentley, an auditor in the defendant's Corporation Audit Section, testified that Eurocom was eliminated from the combined filing with the plaintiff and subsidiaries because the latter did not have greater than one-half of the stock ownership. He alleged that operational unity and ownership control must be present in order for two corporations to be considered unitary for the purposes of a combined

income tax return. The witness conceded that facts proved operational unity existed but alleged that ownership control was required and that this element was lacking. Mr. Bentley testified that:

"* * * It's been our policy always that 50 percent * * * does not give control to one side or the other as far as ownership goes. * * *

"* * * * *

"* * * it's '76 * * * it was codified in the law which states that it has to be greater than 50 percent of the voting stock * * * to consider it * * * as a member of the combined group." (Tr 46-47.)

■ Mr. Bentley's reference is to ORS 314.363(2) which states:

"An affiliated corporation is a corporation that is a member of a group of two or more corporations with a common owner or owners, either corporate or noncorporate, where more than 50 percent of the voting stock of each member corporation is directly or indirectly owned by the common owner or owners or by one or more of the member corporations."

This statute, enacted in 1975 Or Laws ch 760, effective September 13, 1975, created new provisions relating to taxation of corporations on or measured by net income. 1975 Or Laws ch 760, § 3, repeals the former provision, ORS 317.360, relating to consolidation of affiliated corporations, and states:

"* * * The repeal shall first apply to tax years beginning on and after the effective date of this Act."

As above mentioned, Mr. Bentley testifed that, for years prior to 1976, the defendant, *as a matter of policy,* had not included a subsidiary in a combined return unless the holding company owned more than half of the voting stock. (Tr 47.) The testimony contains only the assertion; there was no supporting evidence adduced. Plaintiff has forcefully argued that, in tax years 1974 and 1975, plaintiff met all the criteria of defendant's regulations regarding combined returns (citing ORS 314.363 and OAR 150-314.615-(D) and (E) and a number of court decisions. Pl Open Br, at 8-9.) The argument then runs that, while actual control of a subsidiary was

essential, no rule requiring more than 50 percent of voting stock ownership was ever announced by the department and, as shown by the unusual facts proved in the present suit, such a rule was not essential to insure the proper administrative result in every instance.

▮ Pursuant to Or Const, art IV, § 28, each act passed by the Legislative Assembly (except an act in which an emergency is declared) takes effect 90 days from the end of the session. Therefore, September 13, 1975, is the effective date for 1975 Or Laws ch 760. The first tax year for plaintiff "beginning on and after September 13, 1975," would have been January 1, 1976. The subject years of the plaintiff's appeal are 1974 and 1975. Thus, the mandate of ORS 314.363 is not relevant to a determination of the issue on a statutory basis. The allegedly conclusive effect of the defendant's prior policy, as described by Mr. Bentley, must be examined. A review of apportionment statutes is in order.

Inasmuch as corporations were taxed only upon income attributable to Oregon under ORS chapter 317, the first apportionment-of-income statute under that act, where subsidiary corporations were involved, was ORS 317.360.[1] This section empowered the tax administrator to permit or require a "consolidated" return of "affiliated corporations." The section defined "affiliated," requiring that "[a]t least 95 percent of the voting stock of two or more corporations is owned by the same interests."

▮ The Department of Revenue found this rigid requirement unworkable because a deliberate one percent shift in stock ownership, easily effected, could foreclose the desired jurisdiction to tax. With the adoption of the Uniform Division of Income for Tax Purposes Act in 1965 (ORS 314.605 et seq.), and probably before, the department abandoned the "consolidated return" concept in favor of "combined reporting." The latter was not concerned about a *consolidated* tax report but sought to join subsidiary corporations' businesses with that of the paramount corporation (doing business in Oregon) where the degree of dependency or contribution of each separate corporation to the others constituted a unitary business. *Zale-Salem, Inc. v. Tax Com.*, 237 Or 261, 265, 391 P2d 601 (1964).

---

[1] Repealed by 1975 Or Laws ch 760, § 3

The Oregon Supreme Court in *Coca Cola Co. v. Dept. of Rev.,* 271 Or 517, 533 P2d 788 (1975), repeated the test used in *Zale-Salem, Inc., supra,* by quoting from *Edison California Stores v. McColgan,* 30 Cal2d 472, 481, 183 P2d 16, 21 (1947):

"* * * If the operation of the portion of the business done within the state is dependent upon or contributes to the operation of the business without the state, the operations are unitary; * * *."

"Combined reporting" was followed for tax years 1963 to 1966 in *Coca Cola Co. v. Dept. of Rev.,* 5 OTR 405 (1974). The "combined report" requirement is found in OAR 150-314.615-(E), filed with the Secretary of State December 31, 1971; it is set out with greater particularity in OAR 150-314.615-(D) (as amended December 19, 1975). However, the definition of "affiliated corporation," with respect to combined reporting, was narrowed for the first time by the "more than 50 percent of the voting stock" requirement in the enactment of ORS 314.363, first applicable to tax years beginning on and after September 13, 1975. It was not applicable to tax years 1974 and 1975, which are the only years involved in this suit.

The defendant argues that none of the cases cited by the plaintiff involved situations where majority ownership was lacking and that in the present suit there is an absence of the control necessary to constitute a unitary operation. (Def Br, at 5.)

In *Coca Cola Co. v. Dept. of Rev.* (5 OTR, at 425-426), the court stated:

"The three-unities concept [ownership, operation and use] * * * has been widely criticized. * * * [T]he three unities are, at best, ambiguous, if not actually meaningless. * * *

"* * * * *

"Most courts, contemplating a group of closely connected corporations, attach most significance to the generally accepted test of 'dependent and contributing.' * * *"

In the appeal of *Coca Cola Co., supra,* 271 Or, at 524, the Supreme Court quoted from *Hines Lumber Co. v. Galloway,* 175 Or 524, 538, 154 P2d 539 (1944), that "[n]ormally, a determination as to the character of the ventures conducted by a corporation [,] that is, whether they were unitary or

otherwise in nature, *is a question of fact and not of law."* (Emphasis supplied.)

■ This court recognizes that ORS 314.363(2), today, requires that, in order to be treated as an affiliated corporation, more than 50 percent of the voting stock must be owned by the common owner, but this statute was not effective until after the subject years of the present case. The relevant test, therefore, is one of "dependent and contributory."

The purpose of Eurocom was to develop a European market for computer output microfilm. Unrefuted evidence showed that the technical expertise, the COMTREVE software process and the marketing and management skills were provided to Eurocom solely by the plaintiff. The evidence forcefully indicates that Eurocom's existence depended upon plaintiff's contribution to such a degree that the test set forth in *Zale-Salem, Inc., supra,* has been adequately met. The court finds that Eurocom and the plaintiff were engaged in a unitary business and that Eurocom was properly included in plaintiff's combined 1974 and 1975 Oregon excise tax returns because, in fact, U. S. Bancorp and its subsidiary, U. S. Datacorp, actually and effectively controlled Eurocom.

*Bad Debt Issue.* The second issue to be determined is that of the addition of $2,125,000 in 1974 to the plaintiff's bad debt reserve of only $1,000. Commerce Mortgage Company (Commerce), a mortgage loan company in the business of making and servicing mortgage loans, was plaintiff's wholly owned subsidiary during the subject year. In October 1972, Commerce made loans of approximately $4,650,000 to three individuals who formed a joint venture to construct and operate a 292-unit apartment house. (Pl Ex 1, 2 and 3.) A large number of units were destroyed by fire in June 1973. In addition to this loss, there were substantial overruns on the project which the borrowers could not cover and the joint venture defaulted on its notes to Commerce. In April 1974, Commerce filed a foreclosure suit and was granted the status of mortgagee in possession in order to complete the construction. No portion of the principal amount of the loans nor any interest were paid after January 1974. The plaintiff determined that the borrowers had no individual assets and that there was a significant difference between the amount loaned

on the property and the fair market value of the collateral as determined by an independent appraisal.

The Federal Reserve Board, after examining Commerce's records, advised Commerce to establish a reserve for the loss in value of the receivable. Plaintiff's accountant, Mr. Allen Hatfield, with Deloitte, Haskins & Sells, also advised that a loss of the asset was occurring and that a provision should be made to recognize the decline in realizable value of the receivable. (Tr 60.)

The estimated loss of principal was determined by a comparison of the amounts loaned by Commerce and the fair market value of the collateral. The determination of fair market value was made by a property appraisal expert, proving the money loaned was approximately $2,125,000 more than the current appraised market value. Mr. Hatfield testified that this amount:

"* * * reflected a provision for a loss as indicated by the circumstances at that point in time." (Tr 61.)

This amount was added to the plaintiff's reserve for bad debts and deducted on plaintiff's 1974 Oregon excise tax return. The defendant disallowed the deduction.

Mr. Bentley, defendant's witness on the second issue also, testified that the defendant's Audit Department disallowed the bad debt adjustment because a loss had not yet occurred. He explained that this determination was based upon:

"* * * [ORS] 317.280 and I believe there's a subparagraph in there specifically for financial institutions." (Tr 77.)

The witness alleged that, based upon this statute,

"* * * losses or bad debts are allowed based on a prior experience of actual losses, 20-year moving average and, in some circumstances, 10-year or 5-year moving average under approval by the department." (Tr 77.)

The witness's reference above is indeed found in the Department of Revenue's administrative rule, OAR 150-317.280(3), but this rule is specifically designated "Bad Debt Reserves of Commercial Banks."

ORS 706.005 defines a "bank" as:

"(2) * * * a corporation with capital stock which is * * * authorized to engage in a banking business * * *.

"* * * * *

"(4) 'Banking business' means the business of soliciting, receiving or accepting money or its equivalent on deposit as a regular business * * *."

It has been stipulated that during 1974, Commerce was an Oregon corporation engaged in the business of construction and other loans. (Stip, at 2.)

■        Clearly, Commerce does not fit within the category addressed by OAR 150-317.280(3), which is restricted to bad debt reserves of commercial banks. In regard to bad debts, ORS 317.280(1) states:

"In computing net income there shall be allowed as a deduction any debt which becomes worthless within the taxable year, and charged off in accordance with regulations prescribed by the department (or, in the discretion of the department, a reasonable addition to a reserve for bad debts)."

The preponderance of the evidence presented indicates that a substantial part of the loan granted by Commerce would not be collected. By means of a special appraisal to determine the fair market value and a comparison between the figure thus established and the amount of loans granted, a probable loss was ascertained and a corresponding adjustment made to Commerce's bad debt reserve.

No evidence was presented that the appraisal of the collateral was in error. No evidence was presented to refute plaintiff's contention that the debtors were judgment proof. The defendant's denial of the deduction because no actual loss had been suffered was apparently based upon a misconception.

Cross-examination regarding the premise upon which defendant based its denial of the plaintiff's deduction resulted in the following dialogue:

"Q    Well, that's a rule for financial institutions, is it not?

"A    Yes.

"Q    But Commerce Mortgage Company is not a financial institution, is that correct?

"A    I believe it is. I believe we considered it such." (Tr 79.)

The court does not share that belief. The department regulation upon which Mr. Bentley relies specifically referred to bad debt reserves for commercial banks. Commerce in no way fits the statutory definition of a commercial bank.

The plaintiff has convinced the court that the account receivable was uncollectible and that a loss should be recognized. The appraisal of fair market value offered by the plaintiff was not challenged. A study of the pertinent federal and Oregon statutes and regulations appears to follow plaintiff's citations of cases allowing a reasonable addition to plaintiff's bad debt reserve, under the facts in this case, notwithstanding the actual lack of loss experience. *Industrial Credit Co., Inc. v. Commissioner,* [CCH] 26 TCM 1967-75; *Glenn L. Bolling et al v. Commissioner,* [CCH] 25 TCM 1966-216. The court finds that a proper adjustment was made to Commerce's bad debt reserve and that the plaintiff should be allowed to deduct that addition on its 1974 Oregon excise tax return.

Costs are awarded to plaintiff.